Ex 5




GEORGETOWN UNIVERSITY LAW CENTER

*Criminal Justice Clinic*
*Prettyman/Stiller Fellowship Program*

Dean
Judith Areen

Director
John M. Copacino (DC)

Visiting Professor
Abbe Smith (DC)

Investigation Supervisor
Helen D. Mould

Executive Assistant
Teruko R. Scriven

Adjunct Professors
Hastings Jones (DC)
Mary Victoria Tyler (MD)
Thomas Zeno (MD only)

Supervising Attorneys
Kimberly A. Clark (DC)
Todd E. Edelman (DC)
Kristin N. Henning (DC)
William R. Montross, Jr. (MD)
Mae C. Quinn (DC)

Attorneys
Jamie M. Alter (MD)
Michelle R. Bonner (DC)
Carol J. Gray (DC)
Gail K. Johnson (DC)
Lourdes M. Rosado (DC)

March 11, 1997

Larry Epps DCDC # 188-413
Post Office Box 5200
Maximum Security Facility
Lorton, Virginia 22199

Dear Mr. Epps,

I just wanted to write to you to allay your concerns. I have been staying up to date with all aspects of your case, and I will make certain that the Parole Board is also fully informed of all aspects of your case. As I am sure you are aware, for an early initial hearing the Progress Report is not due until 45 days before the hearing. Your hearing is scheduled for April 10, 1997, so it is not time for your Progress Report to become available.

I have received the newspaper article that you sent me, and as you requested, I have copied and returned it. You have mentioned other items that you have sent to me, however as of yet I have received three letters, the one newspaper article, and no other information. If there are additional items that I should have received please let me know.

If there is anything else that I can do for you please let me know.

Sincerely,

[signature]

Ethan A. Berghoff

111 F Street NW Washington DC 20001-2095

Pg. 2.

April 22, 1990 Murder case as it relates to the enclosed!

# Letter Stirs Debate After Acquittal

## *Writer Says Jurors Bowed to Racial Issue in D.C. Murder Case*

By Barton Gellman and Sari Horwitz
Washington Post Staff Writers

One young juror was crying when the verdict came. The prosecutor gaped as it was read. The crashing sound in the courtroom was the defendant, whose elation propelled him backward over his chair.

Darryl Jerome Smith was not guilty of murder. He did not kill Willie Wilson in the stairwell. So said the jury, and as far as the law is concerned, the case is closed.

Three weeks after the March 6 verdict, a letter arrived at D.C. Superior Court that caused a sensation among prosecutors and police. The letter, from an anonymous juror, said that most of the jury believed Smith was guilty, but bowed to holdouts who "didn't want to send anymore Young Black Men to Jail."

"He should be put on trial again," the letter said.

That sentiment was not unanimous among jurors interviewed by The Washington Post. In any event, a new trial is out of the question. Protection against "double jeopardy" is a central constitutional right in American courts. The anguished missive—"I hope God will forgive me," it said—provides no basis to reopen the case.

Still, the letter became a lightning rod for debate about D.C. juries, described by some police as lenient, but by others as eager to

See JURY, A14, Col. 3


DARRYL JEROME SMITH ... acquitted of murder charge

Pg 3

# Racial Issue Raised in Not-Guilty Verdict

JURY, From A1

convict. It also provides a rare view into the cloistered deliberations of nine women and three men who decided one defendant's fate.

The letter's authenticity is uncertain. No juror interviewed acknowledged authorship. But all agreed that it reflected inside knowledge of their deliberations, and officials familiar with the case said it appeared to be authentic.

A jury must be unanimous to convict or acquit. To convict someone, each juror must be convinced of guilt "beyond a reasonable doubt." Interviews with 10 of the 12 jurors in the Smith case reveal deep rifts over the meaning of those words. The jurors were moved by the trial's portrayal of life in a crack house and troubled by the government's conduct in making its case. In the end, most jurors agreed, race played a role in their decision.

Of the eight who expressed firm opinions, four said Smith was guilty beyond a reasonable doubt, and four said he was not. Six of the 10 said race helped lead to his acquittal. The two others didn't respond to repeated interview requests.

"Sitting here as a black person," D.C. Police Chief Isaac Fulwood Jr. said, "I think [the letter is] an aberration. I hope it's not a trend .... If one juror made a decision based on race, that was an improper decision."

Smith's trial was an unlikely candidate to bring racial debate to a jury room. The dead man was black, and so were the defendant, all the jurors and nearly all the witnesses.

"There are certainly cases that have certain racial overtones," said Jamie S. Gardner, Smith's public defender. "This was not one of them."

"I think my client was acquitted," she said, "because he didn't commit this homicide."





792

If a person participates in a crime, and a murder was committed, can that person be charged with 2nd degree murder, even if that person didn't commit the murder?

2:55
6 March 90

Does Count (3) have anything to do with Second degree murder? How do they relate to (Felony murder rule)

3:50 pm 792

792 6 March 90

We have reached an unanimous decision at this time.

3:58

To whom it may concern, Sir

I was a Juror On the Daryl Smith Murder trial, Feb. 21, 1990 Court Room # 318

I Compromised along With the other Jurors, I feel so bad about it, I had to Write this letter.

He should be put on trial again, if [illegible] do it.

I Can't give You my Name, I don't want to go to Jail, for What I did.

The evidence and a eye witness, Made him guilty of Murder, 10 of Us believed that. We gave in to our foreman and her friend.

Our foreman said she didn't want to send anymore Young Black Men to Jail, even if he did Kill that Young Man [illegible].

I am sorry, I will never Compromise if I have to serve on a Jury again.

I let a Man go free, for Murder, with My Vote, I hope God Will forgive Me.

At right is an anonymous letter about the verdict sent to the courthouse; at left, notes from the jury during deliberations.

■ Young, who became the prosecution's star witness, was a 16-year-old escapee from juvenile detention. Detectives questioned him for two days without a lawyer and enlisted his mother to beg on her knees for his cooperation. When Young complied—saying that he handed Smith the gun and laughed as Smith fired the fatal shot—prosecutors charged him with first-degree murder as an accessory. Young could plead guilty to a lesser charge, Howes said, but only if he testified against Smith.

Joseph Calhoun, ...

... witnesses that you have."

Some jurors didn't agree.

"The witnesses were wined and dined," said Frank E. Bryant, 59, a city-employed paralegal and a strong voice for acquittal. "Each time those people came down there, they were given $30 [in witness fees]. Some of those people collected over $300 .... Come on! He [prosecutor Howes] was coaching them into saying something."

Many jurors said they were

over that the world get better," said a 30-year-old custodian on the jury who requested anonymity.

"I prayed when this case was

Inside the apartment at the high-rise, the jury heard, people spent whole days smoking or selling or trading their bodies for crack. Smith testified he gave a $10 rock to a pregnant woman for a 15-minute sexual encounter.

Pretrial rulings on the evidence barred Howes from alleging before the jury that Smith and the dead man were rival drug dealers. But at trial, defense attorney Gardner complained that Howes was insinuating as much.

"There isn't a juror sitting here who isn't going to figure out very soon what was going on," she told D.C. Superior Court Judge Frederick H. Weisberg. But "the government should take pains not to make it more obvious."

Many jurors read between the lines. Others did not.

"To me it was clear that he [Smith] was a drug dealer," said juror Clifton A. Hammond Jr., 36. "I couldn't even get that point across" to jurors opposed to conviction.

Even before deliberations, jurors discussed race. The anonymous letter-writer and most jurors interviewed said forewoman Valerie L. Blackmon, 36, was most vocal.

Four jurors said that before deliberations, Blackmon gave out what they called "Farrakhan literature," referring to Nation of Islam leader Louis Farrakhan, and that she wore a button supporting a separate state for American blacks.

In an interview, Blackmon said her handout was not "a publication of the Nation of Islam . . . . I give all kinds of information to people."

As for the button, she said, "What I had on didn't make any difference. Maybe that's their prejudice. I was working with all grown people who made up their own minds based on the evidence."

Blackmon grew angry at the letter's charge that "our foreman said she didn't want to send anymore Young Black Men to Jail, even if he did kill that Young Man over drugs."

"That's a lie," Blackmon said. "That coward couldn't even sign it."

Juror Thomasena Hart said Blackmon had expressed reluctance to convict a black man. Juror Isaac D. Beatty said he had not heard the remark himself, but heard from another juror that Blackmon said it.

Most jurors interviewed said the racial debate in the jury room behind Courtroom 318 was more complex.

A retiree, 57, who declined to be named, said Blackmon and her allies asserted the criminal justice system is stacked against blacks. "She said that she knew how the system works, and how you can get to attorneys, and sometimes they can pay people off . . . . She knew how a lot of the times the judges, all of them can be bought, swayed," the juror said.

"That didn't sway me one way or the other," said the juror, who agreed there was reasonable doubt of Smith's guilt.

Hart, 50, a registered nurse, said she debated Blackmon about race and criminal responsibility. Blackmon was "trying to stir up trouble, trying to blame the system, saying that everything that happens to a black person, society is to blame," Hart said. "Like you would be justified if you went out and robbed a bank if you couldn't get a job.

"If we'd have had a Polaroid print," Hart said, "I don't believe she'd have found that man guilty."

Blackmon found an ally in Bryant, the paralegal, Hart said. The two "were talking about slavery, and how we got here and stuff like that. How we were sold into slavery. [Bryant] was talking about different tribe names."

Bryant, on the other hand, said in an interview that "race never even came up . . . . I wouldn't let that type of issue permeate our deliberation."

Another juror, who requested anonymity, said the criminal charges against Mayor Marion Barry helped build an impression among some jurors that blacks in general are under attack.

"To some extent, the problem we have with the mayor influenced some members of the jury," he said. "It was a white-black thing. There was some feeling that this guy was being railroaded. It made it harder to find him guilty."

Even among jurors who thought race played a role, many said it was secondary. For them, there were two holes in the government case: Where was Epps? And where was the gun?

Epps's absence was never explained to the jury. Officials said later that they kept him off the stand because he had already pleaded guilty to an unrelated murder, and they worried how that would play with jurors. As for the gun, police never found it.

The jurors, who could not agree on the credibility of human witnesses, said they needed scientific evidence to settle their differences. "Whose fingerprints were on the gun?" Blackmon asked.

With a hard core of support on both sides, Hammond suggested a compromise. How about second-degree murder and armed robbery? Or armed robbery, but no murder? Some jurors said the two sides made progress along these lines. What torpedoed a compromise, they said, were some confusing instructions on the law.

If the two sides could not be reconciled, why didn't they say so to the judge? "At a point, somebody compromises, right, or you get a hung jury," said Thelma H. Scipio, 65, who held out for conviction until the final vote. "Several of us compromised."

Said Carolyn C. Hall, 59, who thought the government's evidence was insufficient: "I've been on juries five or six times before, and most everyone compromises."

"We were already there a long time," said a juror who believed Smith was guilty. "We would have been there two months . . . . I said, 'I want to go home to my family. You just do what you want to do.' "

But the same juror expressed surprise that Howes had not polled the jurors individually—a longshot move sometimes used to challenge a verdict. "I would have said no," the juror said. "That's almost like perjuring myself if the judge asks me and I say I agree."

Gary Hankins, leader of the Fraternal Order of Police, said the letter is discouraging to police.

"Jurors want to get home," Hankins said. "All of the stupid reasons they give are just aggravating as hell. It just adds to the cynicism that's part of . . . being a cop."

"Sometimes we believe that this sort of thing happens, but we have no evidence," said a prosecutor. "If there's some sentiment that we're sending too many young black men to jail, what about the young black men who are getting killed?"

Fulwood and U.S. Attorney Jay B. Stephens were more hopeful.

"I think jurors in this community overwhelmingly . . . care about its security," Stephens said. "They have taken an oath to uphold the law. And they abide by that oath."

Fulwood and others note that most D.C. defendants and jurors are black, and that most trials lead to conviction. "The overwhelming majority of black people aren't going to turn anybody away for the crime of murder . . . . I've got to believe in the process. If I didn't, I've got to get out of here and do something else."

---

Smith's case has a postscript, and a new beginning of sorts. One week after the verdict, the U.S. attorney indicted him on another first-degree murder charge.

Prosecutors allege Smith was an accessory to the fatal shooting of a motorist in the same neighborhood, a day before the shooting in the high-rise. Court documents say Smith wanted the victim's Nissan Maxima because his own Maxima's transmission had broken down.

Smith has pleaded not guilty. The trial will feature many of the same witnesses as last month's case.

Today Smith is living in a halfway house. Recently, sources said, he ran into Larry Epps.

Epps saw Smith near a Metro station, in Northeast, the sources say, and approached him from behind. Placing his hand on his accuser's shoulder, Epps said, "What's happening?"

Smith, the sources said, made no reply. He simply walked away.

Pg. 5

Washington Times June 2, 1995 p A14

PAUL CRAIG ROBERTS

# Cut-off of legal ethics at Justice?

The U.S. Justice Department has shorn itself of legal ethics that hinder its ability to get convictions, and Deputy Attorney General Jamie S. Gorelick is proud of it. The problem with ethics, says Ms. Gorelick, is that "they actually hinder the department's lawful ability fully to carry out its enforcement mission." Well, Jamie, so do the rules of evidence and habeas corpus. Are they next?

The universal ethical norm from which the federal government has disassociated itself is designed to prevent those trained in law from taking advantage of those who aren't. A requirement in all 50 states and one of the American Bar Association's Model Rules of Professional Conduct, the rule says it is unethical to communicate directly with suspects in the absence of their lawyer. What it boils down to is the time-honored principle to have your lawyer present. In the Sixth Amendment to the Constitution, it is the right "to have the Assistance of counsel."

The Justice Department's prosecutors have found it is easier to trap people, or frame them, if their lawyer is not present. In 1934 Supreme Court Justice George Sutherland said the obligation of the Justice Department "is not that it shall win a case, but that justice shall be done." This is regarded as bunk today by Justice Department lawyers who know that their careers depend on conviction rates.

In August 1994, the Justice Department made it clear that when ethical rules get in the way of careers, the rules are expendable. The department issued a regulation that permits U.S. prosecutors to communicate with defendants in the absence of their lawyers. Soon we will be back to beating suspects into confessions.

It is tempting to blame the Clinton administration, unethical at its core, for this junking of legal ethics. However, the policy first reared its depraved head in the Bush administration, where it was looked upon favorably by "law and order conservatives" willing to dampen the crime wave with a policy of conviction at all costs. Many Republicans go along with this policy of creating an elite corps of federal prosecutors who are above ethics and exempt from judicial control.



Increasingly, federal judges are dismayed by prosecutorial misconduct and the refusal of the Justice Department to take disciplinary action even in cases when judges file written findings of misconduct. Suborning perjury and withholding exculpatory evidence are becoming routine methods of conviction. In a notorious 1993 case, federal judges overturned convictions that federal prosecutors had obtained through the use of alcohol, drugs, sex and perjured testimony. Senior defense attorneys say they now see more cases of government misconduct in one year than they formerly saw in a lifetime.

States are not rolling over dead for the Justice Department's assertion of ethical immunity. On May 19, a U.S. Appeals Court thwarted what the Legal Times calls "the Justice Department's six-year battle to shield federal prosecutors from the scrutiny of state bar authorities." The ruling permitted New Mexico state disciplinary actions to proceed against Assistant U.S. Attorney G. Paul Howes for directly communicating with a murder suspect without the consent of the suspect's lawyer.

The Justice Department argues it has the right to water down the ethical rules for its attorneys and that the supremacy of federal law over state law protects its attorneys from interference when they violate the legal standards imposed by states. In other words, the federal prosecutor can fight dirty in court, but the defendant's attorney is bound by strict ethical norms. As Associate Deputy Attorney General Seth Waxman puts it, federal prosecutors must be protected from sanctions when they don't follow the same rules that everyone else has to follow.

As the forces line up in this battle, it is clear that the struggle is between proponents of big government and the proponents of federalism. If Senate Republicans really believe in the federalism on which they based their balanced budget plan, they will delete their crime bill provision that makes federal prosecutors a special class that is unaccountable under the ethical standards that govern legal conduct.

*Paul Craig Roberts is a columnist for The Washington Times and is nationally syndicated.*

ɜnd also failed to before the Panel.

aw arrived at the Commission for his Upon discovering y written down the tely requested that aring or reconsider iitted a second re- n several months complaint was not peared before the he informal meet- ıad failed to estab- for rehearing or in § 354.2 of the enied his request.

ɜt the initial deci- oke his license is evidence. *See Ge- f Columbia Hack-* 533 A.2d 909, 910 decision must be is supported by *ee also Jones v. Hackers' License* 6, 897 (D.C.1983); *lumbia Hackers'* A.2d 1094, 1096 430 U.S. 937, 97 '84 (1977). Yaw, ıt the revocation ıse the Panel de- hearing or recon- the reason for its

'hether the Panel ɜr its earlier deci- sound discretion. 35 A.2d 156, 159 owing of clearest erference of the denial of rehear- mbia Real Estate Panel in making ict of Columbia adopted a rule ds upon which a onsideration may ound being the dence to develop ential to proper

decision." 18A DCMR § 354.2 (1987). The Panel found that Yaw had failed to establish in his petition any of the grounds for rehearing or reconsideration listed in § 354.2. We are satisfied that the Panel did not abuse its discretion in denying Yaw's request.

**[2, 3]** Yaw further contends that the Panel violated his right to due process when it imposed a $500 fine for his two failures to appear without first having provided notice and an opportunity to respond to the charge that he had thereby violated the instructions of the Panel.[1] The District concedes that the Panel should have provided Yaw a hearing on these charges before deciding whether to impose a fine. We agree.

The notice Yaw received did not inform him that any charges that he failed to appear would be decided at the scheduled hearing. The letter to Yaw informing him of the original charges advised him that his "failure to obey this notice is a violation of Taxicab Commission Regulations, and *will* result in a hearing before the Commission's Panel on Adjudication," suggesting that there would be a second hearing at which these violations would be heard. Show Cause Letter from the District of Columbia Taxicab Commission to Nana Yaw (Mar. 30, 1989) (emphasis added). Because Yaw was entitled to be made aware of the scope of the charges to be addressed at the hearing, we remand this case to the Commission. If the Commission, in its discretion, decides to proceed further with this matter after remand, the Commission should direct the Panel to provide notice of the failure to appear charges and to conduct a hearing at which Yaw will have the opportunity to explain his conduct. *See Hedgman v. District of Columbia Hackers' License Appeal Bd.*, 549 A.2d 720, 724 (D.C.1988).

*So ordered.*




1. Yaw also contends that the Panel lacked the authority to impose a fine for his failure to appear violations, asserting that the Taxicab Commission has not promulgated any rules providing for "failure to appear" sanctions. On remand, the Panel should state the basis of its authority to impose such sanctions.

**Darryl J. SMITH, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**No. 90-564.**

District of Columbia Court of Appeals.

Argued April 25, 1991.

Decided May 24, 1991.

Defendant was convicted in the Superior Court, Frederick H. Weisberg, J., of obstruction of justice, and he appealed. The Court of Appeals, Steadman, J., held that: (1) evidence that defendant charged with murder attempted to influence testimony of person who had accompanied defendant to general area of killing was sufficient to establish that that person was a "witness" within meaning of witness tampering statute, and (2) person who had no knowledge of murder charges against defendant but who was approached by defendant in attempt to get that person to testify favorably to defendant at murder trial could be considered a "witness" for purposes of witness tampering charges.

Affirmed.

**1. Obstructing Justice ⚷4**

Proof that person allegedly contacted by defendant was witness or potential witness in case pending in superior court was required to support conviction for witness tampering. D.C.Code 1981, § 22-722.

**2. Obstructing Justice ⚷16**

Evidence that defendant charged with murder attempted to influence testimony of person who had accompanied defendant to general area of killing was sufficient to establish that that person was a "witness"

within meaning of witness tampering statute; person had knowledge of relevant facts immediately surrounding offense and could reasonably be expected to testify concerning them. D.C.Code 1981, § 22-722.

**3. Obstructing Justice ⚷4**

Person who had no knowledge of murder charges against defendant but who was approached by defendant in attempt to get that person to testify favorably to defendant at murder trial could be considered a "witness" for purposes of witness tampering charges. D.C.Code 1981, § 22-722.

**4. Obstructing Justice ⚷4**
**Perjury ⚷13**

Statute prohibiting subornation of perjury, dealing with wide variety of statements under oath, covers instances which would not be reached by witness tampering statute, and witness tampering statute covers more than attempts to seek false testimony. 18 U.S.C.A. § 1503; D.C.Code 1981, § 22-722; § 22-703 (Repealed).

**5. Obstructing Justice ⚷4**

Person who was approached by defendant in attempt by defendant to get him to testify favorably in pending murder prosecution became knowledgeable of facts material to pending litigation, and was a "witness" for purposes of witness tampering statute when defendant contacted him for a second and third time, by becoming aware of defendant's consciousness of guilt in seeking fabricated testimony. D.C.Code 1981, § 22-722.

See publication Words and Phrases for other judicial constructions and definitions.

---

Stephen I. Singer, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Stevan E. Bunnell, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and G. Paul Howes, Asst. U.S. Attys., were on the brief, for appellee.

Before TERRY and STEADMAN, Associate Judges, and KERN, Senior Judge.

STEADMAN, Associate Judge:

The issue in this appeal, although technically one of sufficiency of the evidence, basically involves the scope of the criminal offense of obstruction of justice insofar as it applies to witness tampering. The relevant provision, D.C.Code § 22-722(a)(1) (1989), reads:

> (a) A person commits the offense of obstruction of justice if that person:
>
> (1) Corruptly, or by threats or force, endeavors to influence, intimidate, or impede any juror, witness, or officer in any court of the District of Columbia in the discharge of his or her duties.

Appellant was convicted under this provision for attempting to persuade two friends of his to testify falsely on his behalf about his lack of participation in an alleged murder. We affirm.

## I

Appellant was arraigned on August 24, 1988, for a murder committed twenty-two days before. Shortly after being released, on September 8, 1988, he asked two friends of his, Dominic Dorsey and Joseph Calhoun, to testify that they had been with appellant at the scene of the killing and had seen the killing committed not by appellant but instead by one Larry Epps. As Dorsey testified, "he wanted us to say that—when we went to court, he said he wanted us to be his witness and say that he didn't do it." About 10 days later, appellant again approached Calhoun, along with another friend of appellant, Lamarr Young, and asked them to testify to a more elaborate story also pinning the blame on Epps. Appellant told Young to tell this story "to whoever when I come to court and tell it to the judge." Some days later, after learning that the police wanted to talk to witnesses, appellant, Calhoun, and Young again talked about the story.

In fact, Calhoun was not present at the scene of the killing or anywhere near it. Dorsey was a member of the group that accompanied appellant to the apartment house where the killing took place and was a witness to the events in the apartment

where appellan
(among others)
prior to the killi
not present at
killing, which t
Calhoun initially
States Attorney
killer but eventu
anywhere presen
forward with the
was an eyewitn
that appellant ha
trial, appellant w
but convicted on
of justice under
which related to l
houn and Dorsey

Appellant's ar
the sufficiency of
two counts in som
ed ways. We ta

With respect t
sertion is that no
that at the time
Dorsey was expec
was therefore not
by the statute.[2]

[1] The word
in the statute itsel
ed, without object
order to convict,
prove beyond a re
sey "was a witne
in a case pending
bia Superior Cour
ther instructed:

1. Appellant was not
justice with respec
Young. The trial c
tion for a judgment
of obstruction of ju
Benson-El.

2. Appellant appears
into two parts, nam
expected to testify
self knew or had r
was expected to test
in this distinction f
since a jury could e
and appellant knew

Judge:

ılthough techni-
f the evidence,
of the criminal
stice insofar as
ring. The rele-
§ 22–722(a)(1)

offense of ob-
ıt person:

ıts or force, en-
imidate, or im-
r officer in any
Columbia in the
luties.

ıder this provi-
ade two friends
ıis behalf about
ın alleged mur-

on August 24,
ted twenty-two
being released,
ked two friends
ıd Joseph Cal-
had been with
the killing and
tted not by ap-
Larry Epps. As
ted us to say
urt, he said he
and say that he
ys later, appel-
oun, along with
Lamarr Young,
o a more elabo-
blame on Epps.
l this story "to
ırt and tell it to
er, after learn-
to talk to wit-
n, and Young
ry.

present at the
ywhere near it.
the group that
the apartment
place and was
the apartment



where appellant, the victim, and Epps (among others) were all present shortly prior to the killing; however, Dorsey was not present at the time or scene of the killing, which took place in a stairwell. Calhoun initially told the Assistant United States Attorney that Epps had been the killer but eventually admitted he was not anywhere present. Dorsey refused to go forward with the false story. Young, who was an eyewitness, testified at the trial that appellant had been the killer. At the trial, appellant was acquitted of the murder but convicted on two counts of obstruction of justice under D.C.Code § 22–722(a)(1), which related to his conversations with Calhoun and Dorsey.

Appellant's arguments with respect to the sufficiency of the evidence address the two counts in somewhat different but related ways. We take each in turn.

## II

With respect to Dorsey, appellant's assertion is that no evidence was introduced that at the time appellant spoke to him, Dorsey was expected to testify and that he was therefore not a "witness" as required by the statute.[2]

[1] The word "witness" is not defined in the statute itself. The jury was instructed, without objection by appellant, that in order to convict, the government must prove beyond a reasonable doubt that Dorsey "was a witness or a potential witness in a case pending in the District of Columbia Superior Court."[3] The jury was further instructed:

> The term "witness" means a person who knows or may know facts that are material to a pending case and who is expected to testify in that case, whether or not the person has actually been subpoenaed to testify at that time. A person is not a witness when regardless of his knowledge of material facts bears [*sic*—presumably "there is"] no present expectation or intention that the person will be called to testify.

This was a substantially correct statement of the law. D.C.Code § 22–722 was part of the District of Columbia Theft and White Collar Crimes Act of 1982. In the main, it carried forward the provisions of pre-existing law, D.C.Code § 22–703 (1981), which in turn reflected the provisions of former 18 U.S.C. § 1503 (1970). The Extension of Comments of the chairperson of the Committee on the Judiciary, July 20, 1982, in commenting on proposed section 722, states that "as under the current law, the term 'witness' is intended to mean a person who knows or is supposed to know material facts about a case which is pending and who may be called to testify," citing in a footnote *United States v. Jackson*, 168 U.S.App.D.C. 198, 513 F.2d 456 (1975). In that case, involving 18 U.S.C. § 1503, the court stated that "indubitably, one is a witness, within the meaning of section 1503, when he knows or is supposed to know material facts, and expectably is to be called to testify to them." *United States v. Jackson, supra*, 168 U.S.App.D.C. at 201, 513 F.2d at 459.

[2] The facts here supported a jury finding that Dorsey was a witness within the above definition. As one who had ac-

1. Appellant was not charged with obstruction of justice with respect to his conversation with Young. The trial court granted appellant's motion for a judgment of acquittal on a third count of obstruction of justice relating to one Howard Benson-El.

2. Appellant appears to bifurcate this argument into two parts, namely, whether Dorsey himself expected to testify and whether appellant himself knew or had reason to know that Dorsey was expected to testify. We see no significance in this distinction for purposes of this appeal, since a jury could easily infer that both Dorsey and appellant knew or had reason to know of Dorsey's potential as a witness. In this regard, we think the facts here significantly differ from *Walker v. United States*, 93 F.2d 792 (8th Cir. 1938), on which appellant places heavy reliance. In that case, a split 2-1 decision, the person approached was a co-defendant who could not be forced to testify, and the court apparently thought it important that the evidence show that she "intended to be a witness." No such problem is presented in the case before us.

3. Appellant now takes issue with the use of the phrase "potential witness," but this is a helpful clarification whose import was made clear by the further explanation of the term.

companied appellant to the general area of the killing, he clearly had knowledge of relevant facts immediately surrounding the offense, and could be expected to testify concerning them. *See Toliver v. United States,* 468 A.2d 958 (D.C.1983). Certainty as to one's role as a witness is not the test; it is whether there is a reasonable expectation to that effect. As put in the Extension of Comments quoted above, the issue is whether the person "may" be called to testify. Thus, even if Dorsey is regarded as a potential witness for the prosecution, we think the jury could find him to be a protected "witness."

III

The argument with respect to Calhoun is more intricate. Here it cannot be questioned that at the moment when appellant first approached Calhoun, he (Calhoun) knew no facts material to appellant's murder trial and therefore at that point in time was not a "witness." Appellant asserts that under the statute, a person must have the status of a "witness" at a point pre-existing the moment when a defendant first "endeavors to influence, intimidate, or impede" that person in any statements concerning the offense. The government meets this argument in two mutually reinforcing ways, both of which we think are correct.

A

**[3]** First, however relevant appellant's position may be with respect to witnesses for the prosecution, it fits poorly when dealing with witnesses for the defense. As to the latter, it is the defendant who to a greater or lesser degree determines who are to fall in that category, potential or actual. If, as here, by his actions, a defendant attempts to vest a person with the status of one who "may know" or "is supposed to know"—for it is not actual knowledge that is required—then that person indeed becomes a witness within the meaning of the statute.

The statutory goal of preventing the obstruction of justice requires no less. The provision at issue here by its language covers the broad category of participants, potential or actual, in pending criminal proceedings, and its application extends not only to those who inherently fall within that category by their actual knowledge of material facts but those as well who are by the defendant's own acts brought within that category.

**[4]** The defendant argues that such an interpretation makes meaningless the prohibition against subornation of perjury, contained in another section of the 1982 Act, D.C.Code § 22-2512 (1989). However, that provision, dealing with a wide variety of statements under oath, covers a multitude of instances which would not be reached by § 22-722(a)(1), and the latter section likewise covers far more than attempts to seek false testimony. *Cf. United States v. Partin,* 552 F.2d 621, 631 (5th Cir.) (noting that attempted subornation of perjury "may well" violate witness tampering provision of former federal obstruction of justice statute), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). Furthermore, there is nothing remarkable in the fact that the same act may violate two or more statutory provisions. *See, e.g., Holt v. United States,* 565 A.2d 970 (D.C.1989) (en banc).

B

**[5]** Furthermore, appellant's contact with Calhoun here was not limited to a single encounter. By the time the second and third meetings had occurred, Calhoun had become knowledgeable of facts material to the pending litigation; namely, appellant's consciousness of guilt in seeking fabricated testimony. *See Smith v. United States,* 312 A.2d 781, 784-85 (D.C.1973) (testimony that defendant had threatened a witness constituted highly relevant implied admission of guilt). Indeed, the trial court without objection instructed the jury that they "may consider" appellant's attempts to influence Dorsey and Calhoun to testify falsely as evidence "tending to prove Mr. Smith's consciousness of guilt," although they were not required to do so. While we recognize that reliance upon this theory

standing alone
unanimity pro
raised at trial
instruction ma
error" in that
*States,* 533 A.

For the fore
of conviction

*Affirmed.*

Darnell L

UNITED

District of C

Submi
Decid

Defendant
or Court, Sylvia
controlled sub
The Court of
dence was suff
and (2) whether
tribute heroin
under statute s
imum sentence
specified drugs.

Affirmed.

1. **Criminal La**

When consi
of acquittal, ev
court in light
ment, giving ful
to weigh the ev
ferences, and d

2. **Drugs and N**

Evidence th
undercover pol

ry of participants,
ıding criminal pro-
ation extends not
rently fall within
tual knowledge of
ıs well who are by
ts brought within

gues that such an
aningless the pro-
ation of perjury,
ction of the 1982
(1989). However,
ith a wide variety
h, covers a multi-
h would not be
l), and the latter
far more than at-
mony. *Cf. United*
.2d 621, 631 (5th
ed subornation of
e witness tamper-
ederal obstruction
*denied*, 434 U.S.
Ed.2d 189 (1977).
othing remarkable
e act may violate
provisions. *See*,
*tes*, 565 A.2d 970

pellant's contact
not limited to a
e time the second
occurred, Calhoun
le of facts materi-
on; namely, appel-
uilt in seeking fa-
*Smith v. United*
784–85 (D.C.1973)
t had threatened a
y relevant implied
ed, the trial court
ted the jury that
pellant's attempts
Calhoun to testify
ling to prove Mr.
f guilt," although
o do so. While we
upon this theory

standing alone could present potential jury unanimity problems, no such objection was raised at trial or request for a unanimity instruction made, and we perceive no "plain error" in that regard. *Shivers v. United States*, 533 A.2d 258, 263 (D.C.1987).

For the foregoing reasons, the judgment of conviction appealed from must be

*Affirmed.*




**Darnell L. CARTER, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**No. 90–200.**

District of Columbia Court of Appeals.

Submitted Feb. 27, 1991.
Decided May 29, 1991.

Defendant was convicted in the Superior Court, Sylvia Bacon, J., of distributing a controlled substance, and he appealed. The Court of Appeals held that: (1) evidence was sufficient to support conviction, and (2) whether defendant intended to distribute heroin or cocaine was irrelevant under statute setting forth mandatory minimum sentence for illegal distribution of specified drugs.

Affirmed.

**1. Criminal Law ⟹753.2(8)**

When considering motion for judgment of acquittal, evidence must be viewed by court in light most favorable to Government, giving full recognition to jury's right to weigh the evidence, draw reasonable inferences, and determine credibility.

**2. Drugs and Narcotics ⟹70, 119**

Evidence that defendant gave heroin to undercover police officer after officer asked for cocaine was sufficient to support conviction for unlawful distribution of a controlled substance; evidence that defendant knew what drug he was distributing was not required. D.C.Code 1981, § 33–541(a)(1, 2).

**3. Drugs and Narcotics ⟹70**

Uniform Controlled Substances Act seeks to prohibit manufacture and distribution of any controlled drug, and it does not require that offender know what particular unlawful drug is that he or she is selling. D.C.Code 1981, §§ 22–3812, 33–501 et seq.

**4. Drugs and Narcotics ⟹133**

Whether defendant convicted of distribution of a controlled substance intended to distribute heroin or cocaine was irrelevant under statute setting forth mandatory minimum sentence for illegal distribution of specified drugs. D.C.Code 1981, § 33–541(a)(1), (c), (c)(1).

---

William L. Peters, appointed by this court, was on the brief, Washington, D.C., for appellant.

Jay B. Stephens, U.S. Atty., and James B. Gunther, John R. Fisher, Roy W. McLeese, III, and Wendy L. Wysong, Asst. U.S. Attys., were on the brief, Washington, D.C., for appellee.

Before FERREN and WAGNER, Associate Judges, and MACK, Senior Judge.

PER CURIAM:

Appellant, Darnell Carter, was charged with, and convicted of, distribution of a controlled substance (heroin) in violation of D.C.Code § 33–541(a)(1) (1988). On appeal, appellant contends that the trial court erred in denying his motion for judgment of acquittal and that he was illegally sentenced. We affirm.

The government's evidence showed that on July 5, 1989, Officer Vines was working undercover in an apartment building. Vines testified that appellant approached him and asked if he wanted to purchase some "blow" (a name used on the street to

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CASE MANAGEMENT BRANCH
2004 NOV -9 A 11: 13
FILED

UNITED STATES OF AMERICA,

v. Criminal No. F 9286-88

LARRY D. EPPS

MEMORANDUM ORDER

This case is before this Court for adjudication of the defendant's *pro se* "Motion to Reconsider, Reduce, Modify, or Suspend Pursuant to Superior Court Rule 35." This *pro se* motion (hereinafter "Motion") was filed on July 23, 2004. It is accompanied by defendant's "Motion for Production of Documents (Transcripts), as well as an Application to Proceed In Forma Pauperis. The sentencing judge was the Hon. Peter H. Wolf. Due to the retirement and unavailability of Judge Wolf, this case was certified to this Court on August 25, 2004. Since that time, the Court has reviewed the details of what is revealed in the court record of this closed case.

Based upon the following analysis, this Court finds that the motion is untimely and that this Court lacks jurisdiction to grant any relief. Even if the motion were not untimely, it lacks merit for reasons that are readily discernable from the public record. No hearing is necessary.

In a nutshell, the defendant asks the Superior Court to vacate the entire remaining balance of his prison sentence. Significantly, he does not seek leave to withdraw his plea of guilty. Moreover, the defendant long ago exhausted his appeal rights as to the denial of a previous Rule 35 motion.

While the defendant sets forth a number of accusations and complaints regarding the prosecutor, his former (pre-guilty plea) defense counsel, and the Parole Commission, his issues primarily dissolve into a question of whether the United States Attorney has breached a plea agreement. Even taking his factual allegations as true, there is no basis for finding a breach of the plea agreement.

RELEVANT BACKGROUND OF THE CASE

The pertinent history of this case begins with the entry of his plea of guilty on May 8, 1989, to one count of second degree murder. In exchange for this plea, the government agreed to dismiss another murder case. In addition, another feature of the plea agreement was the defendant's commitment to testify truthfully as a government witness in another prosecution (*United States v. Darryl J. Smith*, Crim. No. F 9938-88). At the time that this unusually generous plea agreement was negotiated, a private practitioner, Shirliemarie M. Gray, Esq. represented the defendant.

On June 23, 1989, Judge Wolf sentenced the defendant to a term of 12 years to life imprisonment.

In 1990, the defendant won relief from this sentence. His new attorney (Carrie L. Fair, Esq., who was an attorney in private practice and who was appointed after Gray

withdrew) filed a Motion for Reduction and Modification of Sentence, pursuant Rule 35 of the Criminal Rules. The United States did not oppose the motion. Instead, the government filed a Response on March 16, 1990, specifically recommending to the Court that the defendant be allowed to attend a drug treatment program as a condition of probation. The government vouched for the defendant's cooperation in the Darryl J. Smith prosecution. In the light of hindsight, it is quite apparent that the United States had regarded the defendant's cooperation as highly valuable. This is because it is unprecedented for the United States to urge a trial judge to put a murderer on probation.

The net result of this Rule 35 motion was that the defendant was placed on probation. A special condition of probation was that defendant enter the Stout Street drug treatment program. The Court suspended execution of the remaining balance of the 12-year term of incarceration.

**Post-Probation Events.** The defendant squandered the relief that he had won. The Hon. Ricardo Urbina revoked the defendant's probation, concluding that the defendant had violated the terms of his probation. Judge Urbina presided over this matter because of the retirement of Judge Wolf. In an order filed on June 27, 1990, Judge Urbina found "by clear and convincing evidence that the defendant has violated the condition of probation which required that he successfully participate in and complete the Stout Street Drug Treatment Program." Furthermore, Judge Urbina wrote:

> After considering the representations of counsel for the parties and the recommendations of the Probation Officer Albert McNeil and the allocution of the defendant himself, the Court orders that the sentence originally suspended be hereby imposed.

Thus, the original sentence of 12 years to life was imposed.

At the time of the revocation of his probation, defendant was still represented by Carrie L. Fair, Esq.

**Post-Revocation Litigation**. Following the commencement of the defendant's prison term, the defendant continued to press for his release from prison. Still represented by Carrie L. Fair, Esq., defendant filed a Motion for Reconsideration and Reduction of Sentence. This motion was filed on July 23, 2004. It was the second Rule 35 motion filed in this case. Unlike the first time, the government did oppose this motion, and Judge Urbina denied the motion in an order filed on June 30, 1991. In effect, the United States did not "allocute" against the defendant, but rendered him extraordinary assistance in gaining his freedom.

Defendant filed a Notice of Appeal with respect to the denial of his Motion for Reconsideration and Reduction of Sentence. In the Court of Appeals, he was represented on appeal by Dennis M. Hart, Esq.

Defendant's appellate counsel filed a Motion to Withdraw. That motion was granted by the Court of Appeals in an order filed on January 12, 1992. In granting this motion, the Court of Appeals also ruled, "it further appearing that there are no non-frivolous issues on appeal, it is [further ordered] that the order on appeal is hereby affirmed." In other words, the Court of Appeals was satisfied that the revocation and re-sentencing was not an abuse of discretion and that the sentence was legal.

In the intervening 12 years, the defendant sought no relief from the Superior Court until the instant motion was filed.

ALLEGATIONS IN THE DEFENDANT'S MOTION

The most efficient way to parse the defendant's contentions is to begin with those that are the most specific.

One, defendant contends that the United States breached the plea agreement. The only alleged promise that the defendant can identify as a "breach" is the alleged promise to waive allocution. See Motion at page 8. The fact that the prosecutor argued in favor of revocation was not in any way a breach of the original plea agreement. It makes no sense that the government would agree to permanently stand mute as to future misconduct of the defendant. To the extent that the defendant could have complained about the government's arguments at the time of the revocation litigation, the legality of the revocation has been resolved conclusively by Judge Urbina and by the Court of Appeals. This Court cannot revisit that subject.

Two, the defendant alleges that his original attorney (Shirleymarie M. Gray, Esq.) was ineffective. Defendant makes a rather crude allegation, in the context of complaining about the tactics used by the prosecutor to secure his cooperation and the involvement of Gray. The defendant states that he had engaged in a rather informal and high-pressure relationship with the prosecutor during the time leading up to the guilty plea. Defendant contends that when he called Gray to complain about the prosecutor's pressure to obtain cooperation, she told the defendant that she was going to file a complaint about prosecutorial misconduct. Defendant states:

> [And] this is when a deal was cut all the way around the board. My lawyer was offered a job with the public defender service, I was offered a plea to second degree murder, to drop the other murder, of which I was indicted. And a big cover up went down. Mrs. Gray was relieved as counsel for petitioner, and stand-in counsel was assigned.

Motion at page 6.

The most damaging interpretation of the defendant's words is a suggestion that the prosecutor (Paul Howes, Esq.) somehow protected himself from a professional misconduct complaint by giving the defendant an advantageous plea offer and by securing a new job for the defendant's attorney. To be sure, this Court utterly discounts the notion that an Assistant United States Attorney obtained a job for Gray with the Public Defender Service. This allegation is palpably absurd and not worthy of belief. That agency is an independent agency in which only the Director can make hiring decisions. Moreover, that agency is the longstanding, ultimate rival of the Office of the United States Attorney. Under no circumstances could this Court credit the notion than an Assistant United States Attorney obtained a job for defendant's lawyer with the Public Defender Service. Irrespective of these factors, Gray had absolutely no connection to any of the events that transpired after the defendant was freed on probation. His incarceration cannot possibly be related to any actions of Gray or of the Howes.

Three, defendant makes several complaints about the prosecutor, implying that these are legally sufficient reasons to reduce the balance of his sentence to zero. First, he complains that the prosecutor obtained an indictment for murder while knowing that the defendant acted only in self-defense. See Motion at page 6. This contention is nothing more than the defendant's own speculation. If he believed that he had a viable self-defense response to the indictment, he should have gone to trial. He elected not to do so. He cannot re-write history.

In addition, defendant alleges that the prosecutor used a bogus tactic to force the defendant out of the Stout Street Drug Program. He essentially alleges that Howes called the officials at Stout Street and told them "to send petitioner back to Washington." See

Motion at page7. Defendant implies that he did not elope from the program at all. These factual issues, however, were litigated before Judge Urbina and the defendant did not prevail. This Court is bound by that decision and by the decision of the Court of Appeals.

APPLICABLE LAW ON RULE 35 MOTIONS

The law is clear that the Superior Court has authority to reduce a sentence, if the motion seeking this relief is filed

> not later than 120 days after the sentence is imposed or probation is revoked, or not later than 120 days after receipt by the Court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or not later than 120 days after entry of any order or judgment of the Supreme Court denying review or, or having the effect of upholding, a judgment of conviction or probation revocation.

Rule 35(b).

The purpose of a Rule 35(b) motion is to allow the trial court to consider, after further reflection, whether the sentence originally imposed was too harsh in light of the defendant's pretrial conduct. *See Williams v. United States*, 470 A.2d 302, 310 (D.C. 1983), *cert. denied*, 472 U.S. 1019 (1985).

A motion seeking reduction of sentence is basically a plea for leniency and is addressed to the trial court's sound discretion. *See Walden v. United States*, 366 A.2d 1075, 1077 (D.C. 1976).

ANALYSIS OF THE RULE 35 MOTION

In conclusion, the defendant has not raised any non-frivolous issue that requires an evidentiary hearing or production of transcripts (as he has requested). The Court finds

that it would be a waste of time to order the government to respond to the instant motion, because the public record reflects that the motion is untimely and that the Superior Court simply lacks jurisdiction to entertain the underlying merits of the motion.

The lack of timeliness is not a close question at all. The defendant allowed 12 years to drift by before seeking relief in his present motion.[1]

OTHER POTENTIAL ISSUES

This Court notes that the defendant has made reference to D.C. Code §23-110, in making the accusation that his original defense lawyer was somehow coaxed to abandon a potential ethical complaint about Howes. The Court must deny relief on the basis of this allegation, for several distinct reasons.

First, the Court must be clear about what the defendant is actually seeking in the present motion. He is not asking to withdraw his guilty plea. He does not say that he was dissatisfied with it or that it was coerced. He does not seek correction or reduction of his sentence on the grounds of illegality of the sentence itself. Rather, the only relief he seeks is that his sentence should be commuted to "time served."

The defendant's use of a reference to Section 110 does not convert this case into a broader form of litigation than it initially appears to be. The law is quite clear that "the nature of a motion is determined by the relief sought, not by its label or caption." *Diamen v. United States*, 725 A.2d 501, 507 (D.C. 1999), quoting *Frain v. District of Columbia*, 572 A.2d 447, 450 (D.C. 1990) (citation omitted); *see Martin v. United States*, 614 A.2d 51, 53 (D.C. 1992), citing *Wallace v. Warehouse Employees Union No. 730*,

[1] He does not explain this lengthy silence.

482 A.2d 801, 804 (D.C. 1984). In the present case, this means simply that the defendant's motion (regardless of its internal allegations) must be treated as a motion filed pursuant to Rule 35 of the Superior Court Criminal Rules.[2] There is no basis for diverting the discussion to a traditional, Section 23-110 analysis.

Section 110 does not mandate commutation of sentence as a form of relief for ineffective assistance of counsel. The trial court is empowered by the Code to vacate the judgment and "discharge" the defendant if the court finds that the sentence is "not authorized by law or is otherwise open to collateral attack." In the present case, however, the legality of the probation revocation had been resolved over a decade ago by the Court of Appeals. Consequently, this Court has no authority to end the defendant's sentence, even if this Court should credit the multifaceted allegations of the defendant. Gray had absolutely no connection to the scenario in which the defendant violated the terms of his probation. The defendant's own actions are the operative reasons for his incarceration.

On the whole, then, this Court discerns no basis on which to grant any relief to the defendant.

WHEREFORE, it is by the Court this 9th day of November, 2004

ORDERED that defendant's *pro se* Motion to Reconsider, Reduce, Modify or Suspend Pursuant to Superior Court Rule 35 is hereby denied; and it is

FURTHER ORDERED that defendant's *pro se* Motion for Production of Documents (Transcripts) is hereby denied; and it is

---

[2] Indeed, where a defendant complains about the performance of his counsel, the only logical remedy is to permit defendant to have a new trial altogether or to permit him to withdraw the plea of guilty at which the offending lawyer represented him. Here, the lawyer is question was not the lawyer who actually

FURTHER ORDERED that defendant's *pro se* Application to Proceed In Forma Pauperis is denied as moot.

Cheryl M. Long
Judge

Copies mailed to:

Larry D. Epps (#36966-118)
United States Penitentiary
P.O. Box 150160
Atlanta, Georgia 30315

Chief, Special Proceedings Section [FYI]
Office of the United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20001

represented the defendant at the plea and never represented him thereafter. Thus, there cannot be any causal connection between anything that Gray did and the fact that the defendant is now incarcerated.

Ex (6)

IN THE SUPERIOR COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States of America,<br>Respondent,<br><br>vs.<br><br>Larry D. Epps,<br>Petitioner. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Criminal Case No.: F-9286-88 |

MOTION FOR POST-CONVICTION RELIEF
UNDER D.C. CODE SECTION 23-110

COMES NOW, Larry D. Epps, the petitioner *pro se* in the above-styled action under §23-110, and would respectfully move this Honorable Court for post-conviction relief in this matter and avers as follows:

## I. JURISDICTION

This Court has subject matter and personal jurisdiction over issues and litigants pursuant to District of Columbia Code §23-110, (2001).

## II. PROCEDURAL BACKGROUND

After being indicted for First degree Murder in 1988

the petitioner entered a plea of guilty on May 8, 1989, to one Count of Second Degree Murder under §22-2404. In exchange for his guilty plea, the government agreed to, among other things, dismiss another murder case against petitioner.[1/] ~~(Shirliemarie M. Gray, Esq. Rep. Epps)~~

On June 23, 1989, Honorable Judge Peter H. Wolf sentenced the defendant to a term of 12 years to life imprisonment. Subsequently, petitioner filed a motion under Rule 35, D.C. Rules of Crim. Proc., which was ultimately granted on April 9, 1990, resulting in petitioner's original sentence being suspended to five (5) years probation. (Carrie L. Fair, Esq. representing)

On June 26, 1990, the petitioner's probation was revoked and the court reinstituted petitioner's original sentence at 12 years to life imprisonment. No appeal was filed by counsel (Carrie L. Fair) for review of revocation proceedings. Instead, counsel filed a Rule 35 motion for reconsideration and reduction of sentence on October 16, 1990. The Superior Court denies Epps' Rule 35 motion on January 23, 1991, and a timey appeal ensued. (Dennis M. Hart, Esq. representing). Ultimately, the D.C. Court of Appeals relieved counsel and affirmed the Superior Court's decision denying Rule 35 motion.

---

1/ Criminal Case No. F-14510-A88. This other criminal case is setforth in an opinion by the D.C. Court of Appeals at Smith v. U.S., 591 A.2d 229 (D.C. App. 1991), and remains a significant factor in this post-conviction ligigation as a "Smith Murder Case."

On July 23, 2004, Epps filed his third Rule 35 motion pro se with the Superior Court. On November 9, 2004, the Honerable Cheryl M. Long, Superior Court Judge, summarily dismissed Epps Rule 35 motion as untimely. Epps did not seek appellate review of Judge Long's decision.

## III. GROUNDS FOR RELIEF

A. PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION, STRICKLAND V. WASHINGTON, 466 U.S. 688 (1984); MONROE V. U.S., 389 A.2d 811 (D.C. App. 1978)

1. Facts/Background Criminal Case No. F-9286-88.

The petitioner's present murder conviction and sentence precipitated from an incident that occured on July 13, 1988, at an apartment located at 634 I Street, S.E. Apt. 32, Washington, D.C.

(a) Government's Verision of Events:

On Wednesday, July 13, 1988, at about 9:40 p.m. Officers of the First District responded to 634 I Street, Southeast, apartment 32, for a shooting. When they entered apartment 32, they observed a black male lying on the living room floor suffering from a gunshot wound to the head. The body was removed from the scene and transported to D.C. General Hospital where the decedent was pronounced dead at 11:00 p.m. by Dr. Daniels of staff.

On July 14, 1988, an autopsy was performed on the decedent by Dr. Pierre-Louis who ruled the Manner of Death a Homicide and Cause of Death due to a gunshot wound to the head.

A witness was interviewed and stated it was inside of apartment 32 along with the decedent and subjects known to it as Larry and Lawrence. The witness states that Larry and Lawrence were in the bedroom with the door closed and that the witness and the decedent were in the living room. The witness went into the bathroom to put some cold water on it's face. About five to ten minutes went by and the witness heard a gunshot. The witness exited the bathroom and then immediately observed the decedent lying on the floor unconscious and suspects Larry and Lawrence standing over the decedent's body. Lawrence ran into the bedroom of the apartment and Larry armed with a handgun ran toward the witness. The witness ran into the bathroom and while inside of same he became involved in a struggle with Larry over the gun. At this time the gun discharged. The witness pushed Larry out of the bathroom and into the bedroom where he observed Lawrence reach behind the bed and produce a second handgun. The witness pushed Larry onto the bed, ran out of the bedroom slamming the door behind him, ran into the bathroom and closed the door and jumped out the third floor window.

A second witness was located and related it heard two gunshots coming from 634 I Street, S.E., and observed two subjecrs run out of the building armed with handguns.

A third witness was located and stated it heard two gun-

shots and observed two subjects run out of 634 I Stree, Southeast, and that one of the subjects was carrying 3 to 4 bags, one of which appeared to be a gym type bag.

Further investigation revealed that prior to the shooting the decedent had a bag containing money inside of the apartment and the witness had a couple of bags containging clother and personal items, all of which were missing from the apartment immediately following the shooting.

On July 14, 1988, the first witness was shown an array of eleven black and white MPDC photographs and identified the subject known to him as Larry. The photograph was that of one James Washington aka Larry Darnell Epps, MPDC PDID #304-430.

Based on the above mentioned facts and photographic identification, it is requested that an arrest warrent be issued charging James Washington aka Larry Darnell Epps with Felony Murder while Armed.

(b) Petitioner's Version of Events:

On or about 7-13-1988, petitioner went to the apartment of Lawrence Dudley @ 634 I Street, S.E. Apartment 32, Washington D.C. to retrieve personal property that had been left in Dudley's care by Epps three (3) weeks previously. Upon arrival at Dudley's residence Epps was greeted by two unknown males (UKM), Epps asked these UKM's if Dudley was present and one said "no" however, Epps could see Dudley thru the door in another back room of the apartment and therefore challenged

the UKM's response. The UKM became aggitated and heated words were exchanged. Dudley then appeared and defused the situtation by informing UKM that he (Epps) was his (Dudley's) partner, and should be allowed entry in the future.

Subsequently, Epps and Dudley went into Dudley's bedroom where Bonney (LNU), Dudley's girlfriend was present.

Dudley had an injury on his face which caused Epps to ask how it happened at which point Dudley explained that two UKM were New york drug dealers who had essentially taken-over Dudley's drug-selling operation out of the apartment. Dudley then left with Bonney to get his methadone and leaveing Epps in the bedroom waiting. During the time Dudley and Bonney were gone the two UKN males conducted drug sales (cocaine) out of residence. Both UKM's had possession of and displayed firearms during these sales. Upon return of Dudley and Bonney, Bonney was sent--by Dudley--to go purchase heroin. During Bonney's absence the UKM's prepared to leave residence and Dudley confronted them about money he (Dudley) figured they owed him for using apartment to sell drugs. An argument between Dudley and one UKM caused Epps to retrieve Dudley's gun from bedroom and return to livingroom where argument continued. The UKM directed his anger at Epps and reached for his gun but Epps was able to fire first, killing the UKM. The secomd UKM came out of restroom (presumably with his firearm) Epps and UKM became involved in struggle over gun; a bullet fired into ceiling and UKM eventually escaped thru window.

2. Facts/Background Criminal Case F-14510-A88 ("Smith Murder Case")

Darryl J. Smith was arraigned on August 24, 1988, for the murder of Willie R. Wilson , committed on August 2, 1988. Smith was released on bail and asked two friends of his, Dominic Dorsey and Joseph Calhoun, to testify that they had been with appellant at the scene of the killing and seen the killing committed not by appellant but instead by one Larry Epps. As Dorsey testified "he wanted us to say that--when we went to court, he said he wanted us to be his witness and say that he didn't do it." About 10 days later, appellant again approached Calhoun, along with another friend of appellant, Lamarr Young, and asked them to testify to a more elaborate story also pinning the blame on Epps. Appellant told Young to tell this story "to whoever when I come to court and tell it to the judge." Some days later, after learning that the police wanted to talk to witnesses, appellant, Calhoun and Young again talked about the story.

In fact, Calhoun was not present at the scene of the killing or anywhere near it. Dorsey was a member of the group that accompanied appellant to the apartment house where the killing took place and was a witness to the events in the apartment where appellant, the victim, and Epps (among others) were all present shortly prior to the killing; however, Dorsey was not present at the time or scene of the killing, which took place in a stairwell. Calhoun initially told the Assistant United

States Attorney that Epps had been the killer but eventually admitted he was not anywhere present. Dorsey refused to go forward with the false story. Young, who was an eyewitness, testified at the trial that appellant had been the killer. At the trial, appellant was acquitted of the murder but convicted on two counts of obstruction of justice under D.C. Code §22-722(a)(1), which related to his conversations with Calhoun and Dorsey.[2/]

3. Allegation of Ineffective Assistance of Counsel

(a) Failure to Investigate: (Counsel Gray)

Counsel's sole strategy was to resolve case by having Epps plead guilty. Towards this end counsel did not (1) conduct proper investigation (2) interview witness or (3) investigate facts and circumstance supporting Epps assertions of self-defense. Had counsel investigated the case she would have discovered that what appeared to be a robbery was actually a drug house dispute that culminated in homcide not intentional murder/robbery. Any taking of property was an after thought; not a premeditated act nor motive for the unfortunate killing. Strategic choices made after less than complete investigation are resonable only to the extent that reasonable professional judgments support the limitations

---

2/ Facts taken from published opinion, Smith v. United States, 591 A.2d 229, 230-31 (D.C. App. 1991).

on investigation. Strickland, supra, Wiggins v. Smith, 539 U.S. (2003), Pavel v. Hollins, 261 F.3d 210 (2nd Cir. 2001); Hill v. U.S., 489 A.2d 1078 (D.C. 1985).

(b) Failure To Investigate, Object And Properly Preserve Government Misconduct (Counsel Gray)

Prosecutor G. Paul Howes conduct in the prosecution of Epps --and abuse of power--was blatent misconduct and counsel was deficient for not properly protecting Epps' rights during this time. The prosecutor repeatedly violated Epps' right to counsel by conducting communications with him after being informed of Epps assertion of, and representation by, counsel. Counsel was informed of the improper communications however failed to properly object or preserve for judicial scrutany. Ultimately, Howes was allowed to manipulate Epps into accepting a murder conviction by using the threat of prosecuting Epps on another murder (Smith case) which Howes knew Epps did not commit. Counsel failed to investigate Smith case allegations that would have provided evidence that Howes knew any prosecution of Epps in that case was unjustified and being used by Howes as leverage to coerce Epps. Mr. Howes used Epps' brother, WAYNE, W. Epps, D.C. to further manipulate and coerce Epps into involuntarily waiving rights and accepting culpability for crimes he did not committ.

Had prosecutor Howes not threatened Epps with a murder conviction in Smith case; promised to lie and hide evidence in the I Street incident; and generally intemidate and coerce,

Epps would have went to trial in both cases and not pled guilty. (Epps realleges and incorporates herein allegations contained infra at "C" and attached Affidavit of Larry D. Epps).

C. Failure To Adequately Advise: (Counsel Gray)

Epps alleges that counsel failed to previde him with competent legal advice that would have allowed Epps to protect his rights while being the subject of Mr. Howe's prosecutorial misconduct; would have allowed Epps to avoid an ill-advised plea-agreement; would have allowed Epps to present his meritorious self-defense stategy at trial; and ultimately allowed Epps to avoid years of imprisonment.

Counsel told Epps that he could not lawfully present a self-defense theory at trial because there was evidence suggesting victim was robbed. Moreover, counsel advised Epps that Mr. Howes' conduct would not warrant dismissal of charges and Epps should plead guilty to second degree murder or face life without parole for first degree murder during robbery. Counsel further advised that no government allecution would prevent any subsequent government position on case.

D. Failure To Present Defense (Counsel Gray)

Epps repeatedly told counsel that he shot man at I Street apartment out of fear and self-defense, however, counsel did not develop this strategy nor present any defense based on Epps

assertions of self-defense. There existed ample evidence to support Epps' contentions that he killed in self-defense. Specifically, the victims history, the circumstances surrounding confrontation events and potential witnesses who could have substanuated Epps' version of events.

(e) Failure To Provide Effective Assistance With Plea Agreement: (Counsel Gray)

Counsel allowed Prosecutor Howes to repeatedly violate Epps' Constitutional Rights and use a murder charge that Epps did not committ (and Howes knew he didn't) to coerce a guilty plea-agreement out of Epps. At no time did counsel make any meaningful eforts to effectively represent Epps interest during the plea-agreement stage. Counsel accepted terms that any other reasonable attorney would have rejected. In particular, agreements to dismiss meritorious court pleading and not allow development of record.

(f) Failure To Object To Deficient Plea Collaquy: (Counsel Gray)

On May 8, 1989, Epps entered his guilty plea before the Superior Court to Second Degree Murder related to I Street incident. At no time during the plea colloquy was Epps advised of maximum sentencing exposure nor did the court properly inquire as to any extranous influances that preciditated Defenant's guilty plea.

Moreover, the facts of case did not support a guilty plea and conviction for second degree murder and counsel should not have allowed the court to accept Epps' guilty plea to that offense. Had Epps been properly advised by the court as to the elements of offense and his rights related to such, Epps would not have pled guilty. Hill v. Lockhart, 474 U.S. 52(1985)

(g) Failure To Preserve Speedy Trial Violation: (Counsel Gray)

Epps asserted his Constitutional and Statutory rights to a speedy trial which were ultimately violated. Counsel did not preserve the speedy trial violations or raise such on appeal. Consequently counsel deprived Epps of effective assistance and prejudiced Epps insomuch as charge should have been dismissed.

(h) Failure To Make Objection and Effectively Establish Parameters of Amended Judgment (Counsel Fair)

On April 9, 1990, the Superior Court granted Epp's Rule 35 Motion and subsequently amended judgment to five (5) years probation with the following conditions:

(1) Enter and complete long-term inpatient and out-patient phases of drug treatment program.

(2) Obtain employment

(3) Set-up and serve community service focused towards youth drug rehabilitation.

After having sentence amended (See: J & C dated 4-9-90) AUSA Howes suggested that Epps enter the Stout Street Drug Rehabilitation Program in Denver, Colorado. Epps went to Stout Street and entered program, however, soon discovered that Stout Street was actually a retreat for AUSA Howes' cooperating informants. Epps got into a minor verbal confrontation at job and was arbitrarily and summarily ejected from the program without any procedural due process. AUSA Howes, of course, was the force behind Epps' removal from program.

Based on a sitution that Howes essentially created at Stout Street Epps was subjected to probation revocation and resentenced to original 12 years to life.

Counsel should not have allowed AUSA Howes to sabatoge Epps' rehabilitation process. The Superior Court's J & C order did not require Epps to attend any specific drug rehab center. In fact Epps was in a rehab program after leaving Stout Street, however AUSA Howes' was not satisfied with any resolution short of Epps probation being revoked. Counsel failed to anticipate the need for a specific J & C order that allowed Epps to effecuate the Court's intent without giving AUSA Howes opportunity to defeat Epps programings.

(i) Failure To Object And Preserve Issues For Appellate Review At Probation Revocation Hearing (Counsel Fair)

During Epps April, 1990, probation revocation proceedings

counsel allowed--without objection--the prosecution to violate terms of original plea-agreement and offer objectionable evidence and arguments for revocation. Moreover, counsel allowed prosectuion to misstate the record and terms of probation judgment. Counsel failed to properly advise the court of Epps participation in drug rehab program and make court aware of Epps other efforts to comply with probationary conditions.

Again, AUSA Howes was able to run roughshod over defendant Epps Constitutional Rights by abusing his official position for personal reasons. Counsel should have requested Howes' recusal from case based on his previous misconduct involving Epps criminal proceedings.

Epps was not informed of his right to appeal the courts probation revocation judgment nor was he allowed full opportunity to explain to the court why he failed to complete the Stout Street drug rehab program.

Counsel failed to object when the Superior Court made a finding that Epps violated probationary conditions when in fact the court--based on Howes's misrepresentation of terms--held Epps to a degree of compliance not stipulated in J & C order.

(j) Failure To File Notice Of Appeal And Appeal Revocation Judgment (Counsel Fair)

A defendant has right to appeal a Superior Court's probation revocation judgment. D.C. 24-304. Counsel failed to advise Epps

of his appellate right and did not file Notice of Appeal. Consequently, Epps was deprived his right to have appellate review of the Superior Court's probation revocation ruling.

(k) Failure To Properly Prosecute Post-Judgment Motion (Counsel Fair)

On October 16, 1990, counsel filed a Rule 35 Motion in the D.C. Superior Court complaining about, among other things, the court's probation revocation ruling. To be sure, a Rule 35 motion is not the appropriate vehicle to appeal probation revocation judgment, and counsel raised issues not cognizable under Rule 35 while failing to include meritorious grounds for post-judgment relief available at the procedural juncture.

(l) Failure To Effectively Litgate Rule 35 Appeal (Counsel Hart)

A timely notice of appeal was filed on March 5, 1991, challenging the Superior Court's decision denying Epps Rule 35 motion. Counsel filed an Anders brief and requested removal from case. In spite of AUSA Howes's atrocious record of misconduct in this case attorney Hart chose to ignore such and argue to the D.C. Court of Appeals that Epps' appeal lacked merit.

Epps requested that attorney Hart procure the transcripts of May 8, 1989, plea hearing in order to substaniate arguments

supporting appellate review. On June 7, 1991, counsel in fact submitted motion for transcripts, however, failed to include any factual or legal argument to support request for such transcripts. Consequently, the motion for transcripts was denied by the court, and any recorded facts supporting Epps appellate arguments were allowed to remain outside appellate court scrutany--along with any scrutany of AUSA Howes' misconduct thru-out Epps' criminal proceedings.

B. PETITIONER'S GUILTY PLEA WAS NOT KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY ENTERED IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT, U.S. CONSTITUTION, BOYKIN V. ALABAMA, 395 U.S. 238 (1969); HILL V. LOCKHART, 88 L.ED.2D. 203 (1985)

1. Supporting Facts:

Petitioner would reallege and reassert facts and arguments as presented in Section III, A, 3(a)-(c) above. Such allegations are herein incorporated by referrence as supporting petitioner's claim of coerced guilty plea.

C. PETITIONER'S CONVICTION AND SENTENCE ARE THE DIRECT RESULT OF GROSS PROSECUTORIAL MISCONDUCT IN VIOLATION OF PETITIONER'S CONSTITUTIONAL RIGHTS, U.S. CONSTITUTION, V AMENDMENT BERGER V. UNITED STATES, 295 U.S. 78 (1934); WASHINGTON V. UNITED STATES, 760 A.2d 187 (2000)

1. Supporting Facts:

During the month of September, 1988, an investigator from the Prosecutor's Office came to interview Epps at the Lorton Correctional Facility.

Epps was led to believe that this person was a part of the defense team, but as the conversation progressed Epps discovered this person was from the Prosecutor's office. Epps then terminated the interview and called his attorney.

A few days later, Epps was rousted from his jail cell at 3:00 a.m and told that he was going to Court. Epps knew of no such court date. Upon reaching the court, Epps was advised by Marshall Service that he would be going to another court. He was then taken to the prosecutor's office.

When Epps got inside, his brother (WAYNE EPPS ) was in the prosecutor's office along with a room full of other people. The prosecutor Mr. Howes, turns to Epps in front of his brother and said "Well Larry, I hear that you can get your [expletive] sucked up there in 5929 for a little of nothing." Epps did not respond. Later Howes stated "Larry, we now know you did not commit the murder." Epps asked Howes how he knew Epps had not committed the murder. And Howes stated "Well I now have information that you didn't do it." This was when Epps asked to see his attorney. Howes stated "You don't need a lawyer you're not being charged." Epps asked again for his lawyer, and Howes again assured Epps that he did not need a lawyer.

Epps then said, "Every time I've ever come to court, my lawyer was present." Mr. Howes then stated "There is your brother, you don't heed a lawyer."

Epps then unequivocally invoked his right to counsel. Mr. Howes then ordered Epps' brother to take Epps into another room and talk to him.

On three or four other occassions, Mr. Howes had Epps brought to the Grand Jury, and Epps would have him (Howes) call his lawyer or Epps would call her, and when she would come to the office of the Prosecutor, she would be told that she had just missed Epps. This subterfuge by Howes continued until one day, Epps called attorney and she was able to realize Howes' misconduct herself, attorney promised to complain but didn't. Subsequently, a deal was strück and on 5/8/89, the Court, Judge Wolf, accepted the plea. One of the oral provisions of agreement was, "Drop Prosecutorial misconduct Motion to Show Cause in return No allocution, and no oppossesion to subsequent Rule 35 motion, for reduction and modifacation of sentence.

Meanwhile, Mrs. Gray has accepted a job with the public defender service and has a conflict of interest in Epps case and can no longer represent Epps.

At Rule 35 hearing Carrie Fair, is stand in counsel for the defense. The Court granted relief and ordered probation.

Epps complies with the requirments of the probation order. Mrs. Gray goes with Epps, however is no longer Epps attorney.

Mr. Howes, is willing to aid and assist by offering a

solution to the problem. Stout Street was offered. The next thing Epps knows, the D.A. (Howes) is making all the calls and acting as Epps' lawyer or aid for the defense. Mr. Howes orchestrated Epps' failure from the words: "Stout Street."

When Epps arrived in Denver, Stout Street personnel were not aware of his coming. Epps was there three (3) weeks before being returned to Washington, D.C. per Mr. Howes orders.

Epps entered another drug program, "Ka-Dac." Mr. Howes did not like this program and petitioned for Epps to be placed back in prison until a suitable drug program could be found. That was 15 years ago.

Mr. Howes, used the Smith Case to indict Epps in an effort further his career and use charge to coerce Epps into waiving his rights.

## IV RELIEF REQUESTED

Petitioner would respectfully pray for this Honorable Court to grant the following relief:

1. Issue order to show cause requiring respondent to answer allegations setforth herein;

2. Issue order directing officials to provide petitioner with transcripts to include 5/8/89, Guilty plea, 6/23/89, sentencing, 4/9/90 Rule 35 hearing and 6/26/90 probation revocation hearing;

3. Allow petitioner opportunity to amend/supplement facts support allegations for relief after reciept of transcripts;

4. Allow petitioner to submit traverse to Respondent's answer to 23-110;

5. Appoint counsel and conduct evidentiary hearing to fully develop facts that de hors the established record;

6. Vacate petitioner's conviction and sentence;

7. Any other relief this Honorable Court deems just and proper.

Respectfully prayed for and sworn to under penalty of perjury this 10th day of March, 2005.

/s/ Larry D. Epps
Larry D. Epps
Petitioner, Pro Se

## CERTIFICATE OF SERVICE

I, Larry D. Epps, certify under penalty of perjury that I have served the Respondent's attorney of record with a true copy of this 23-110 motion with accompanied documents by depositing same in prison legal mailbox with First-Class postage attached and addressed as follows:

Done this 10th day of March /2005

Andrew Kyle

/s/ Larry D. Epps
Larry D. Epps

Andrew Kingston
Notary Public Fulton County
My Commission Expires June 1, 2008