SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CRIMINAL DIVISION

- - - - - - - - - - - - - - - - - -:
                                    :
UNITED STATES OF AMERICA            :
                                    :
          v.                        :    Criminal Action No.
                                    :    F-09286-88
JAMES WASHINGTON,                   :
a/k/a LARRY D. EPPS,                :
                                    :
          Defendant.                :
- - - - - - - - - - - - - - - - - -:

                         Washington, D.C.

                         Tuesday, June 26, 1990

          The above-entitled matter came on for hearing before
the Honorable RICARDO M. URBINA, Associate Judge, in
courtroom number 313.

          THIS TRANSCRIPT REPRESENTS THE PRODUCT OF AN
          OFFICIAL COURT REPORTER, ENGAGED BY THE COURT,
          WHO HAS PERSONALLY CERTIFIED THAT IT REPRESENTS
          THE ORIGINAL NOTES AND RECORDS OF TESTIMONY
          AND PROCEEDINGS IN THE CASE AS RECORDED.

          APPEARANCES:

          On behalf of the Government:

          PAUL G. HOWES, Esquire

          On behalf of the Defendant:

          CARRIE FAIR, Esquire

                         BRUCE W. HERZFELD, RPR
                         OFFICIAL COURT REPORTER

                                                              1

PROCEEDINGS

* * * * * *

1

2

3      THE CLERK:  The case of the United States versus

4  Larry D. Epps, also known as James Washington, F-09286-88.

5      MR. HOWES:  Good morning, Your Honor.  Paul

6  Howes, H-O-W-E-S, for the United States.

7      MS. FAIR:  Carrie L. Fair, counsel for Mr. Epps.

8      THE COURT:  All right, Mr. Epps' matter -- I

9  don't see it on the calendar.

10      MR. HOWES:  It is a show cause hearing, Your

11  Honor.

12      THE COURT:  I see.  Yes.  Mr. Epps is before the

13  Court on the Court's order to show cause as to why

14  probation should not be revoked, probation which was

15  imposed on April the 9th, 1990.  Specifically the violation

16  alleges that the basic condition of probation. which was

17  successful participation in and completion of the -- was it

18  the Stout Street program?

19      MR. HOWES:  That's correct.

20      THE COURT:  The Stout Street program was not

21  complied with by Mr. Epps, and as a result of that, he is

22  in violation of probation.  Is that the basic allegation?

23      HOWES:  That's correct.

24      : Your Honor, may I inquire as to

25  whether     ion officer Mr. McNeil is here?  I don't

2

1    believe so.  If he is not here, may we have this matter

2    passed until he does appear?  I believe he is on his way.

3              THE COURT:  He was copied on this show cause

4    order.

5              THE CLERK:  He called, and he was on his way

6    seven or eight minutes ago.

7              MS. FAIR:  I just talked with him last evening,

8    and he indicated he would be here.

9              THE COURT:  We need his input on this, so we will

10   pass on it.  Do you have other business, Mr. Howes?

11             MR. HOWES:  Just across the hall.  I will come

12   right back, Your Honor.

13             MS. FAIR:  Thank you, Your Honor.

14             (Brief recess.)

15                        AFTER RECESS

16             (Jury not present.)

17             THE COURT:  Recalling the case of the United

18   States versus Larry Epps, that is F-09286-88.

19             MR. HOWES:  Paul Howes on behalf of the United

20   States.

21             MR. McNEIL:  Good morning, Your Honor.  Albert

22   McNeil from Adult Probation.

23             MS. FAIR:  Carrie L. Fair, counsel for Mr. Epps.

24             THE COURT:  Mr. Epps is present.

25             Epps is before the Court on the Court's order

                                                              3

1  of a show cause which stems from a violation report filed
2  by Probation which specifies that Mr. Epps failed to
3  complete the long-term in-patient and out-patient drug
4  treatment program, and it specifically details that on
5  April 19, 1990, Mr. Epps was placed on five-year probation
6  and ordered by the Court to enter and complete a long-term
7  in-patient and out-patient drug program and undergo weekly
8  drug testing the first year after its completion, and
9  biweekly the second year after treatment as well; also that
10  Mr. Epps obtain employment, participate in community
11  service, and pay $250 as a victims' compensation fund
12  assessment.
13      The Court is advised that Mr. Epps entered the
14  Stout Street program on April the 25th, 1990, and that
15  absconded from the program on May the 15th, 1990.  Upon an
16  office visit on May the 16th, Mr. Epps expressed to the
17  probation officer that he felt the program -- that he left
18  the program because he just could not make it at Stout
19  Street.
20      On the 17th of May, Mr. Epps was enrolled in the
21  ADASA urine surveillance program (phonetic), and he was, at
22  the time of the writ   of the report, next scheduled for
23  contact with the pr       officer on June the 4th, 1990.
24      It is       ged that Mr. Epps is not
25  employed, has not       himself with community service,

4

1    and has not paid the victims' compensation fund assessment
2    as of the writing of the report.
3          Are there any additional allegations, Mr. McNeil?
4          MR. McNEIL:  None, Your Honor.
5          THE COURT:  What is the recommendation of
6    Probation?
7          MR. McNEIL:  Your Honor, as of the 22nd of June,
8    he was enrolled in the CADAC program.  As I explained to
9    his attorney, CADAC, six months, that is not the length of
10   time that Stout Street is.
11         My assessment of this young man is that he needs
12   some in-patient drug treatment.  He can go on forever and
13   forever and forever and find himself in situations of being
14   locked up and getting in the jackpot, but he desperately
15   needs an in-patient drug treatment program.
16         I understand the fact that he is in contempt, so
17   to speak, but he didn't complete the Stout Street program.
18   When I talk to him on occasions, he really seems at times
19   not to be in touch with the fact of the -- with the
20   seriousness of his drug situation and the seriousness of
21   the offense he committed -- because the fear of -- the fear
22   of -- it has    ome a time where the fear of staying in
23   the progra.     ing to bring about change has to be
24   greater t        r of -- or the fear of not changing
25   has to be        n the fear of trying to change.  You

5

1    know, the fear of being incarcerated has to be greater than

2    that fear of change.

3            It seems that he has to have some type of

4    understanding that in these programs things are just not

5    going to go his way, and CADAC is just a lesser term in

6    terms of time than Stout Street, but it is the same type of

7    program.

8            I am all for him staying in the treatment, but I

9    don't know, Your Honor, he -- I am keeping my fingers

10   crossed that if he was allowed to stay in treatment, that

11   he would make it in the treatment program, whatever it

12   would take.

13           THE COURT:  The plea in this case was to second

14   degree murder?

15           MR. HOWES:  That's correct.

16           THE COURT:  Ms. Fair?

17           MS. FAIR:  As a matter of clarification, if I

18   may, Your Honor, I believe Mr. McNeil -- please correct me

19   if I am wrong -- is saying that Mr. Epps is in a program

20   now, CADAC, which is a program at St. Elizabeth's Hospital.

21   It's a therapeutic program, as I understand it, which is

22   the same as Stout Street.  It, of course, does not have the

23   length      Stout Street has.  Stout Street, as I

24   unde        , is a program where you are in residence for

25   two         years, and CADAC on the other hand is a

6

1  program where you are in residence for six months, you are

2  out for six months, and I believe it can be extended, based

3  on the conversations that I have had with persons at CADAC.

4  And we do have someone here in the courtroom, a Ms.

5  Chestnut, from CADAC this morning.

6          Getting back to Mr. McNeil's recommendation, I

7  believe his recommendation is that Mr. Epps does need

8  treatment.  He is enrolled in CADAC now.  He would like to

9  see him stay in CADAC, and he would like to see him make

10  it, and he has his fingers crossed.  That to me means, and

11  please correct me if I am wrong, Mr. McNeil, that Mr.

12  McNeil is recommending that the Court permit him to stay in

13  that program.  Am I correct?

14          MR. McNEIL:  That's correct, Your Honor.

15          MS. FAIR:  If I may take off from that point,

16  then, Your Honor, we have a recommendation from the

17  probation officer Mr. McNeil, who is saying that he does

18  need treatment, and he is in a program now, and I would

19  like to see the Court permit him to stay in that program.

20  I believe Mr. McNeil is also indicating that he is going to

21  continue to work with Mr. Epps.

22          I would just like to give the Court some

23  background information here, which I hope will clarify the

24  cold black situation of the words on the piece of

25  paper, the being a violation report, if I may.

7

1         THE COURT:  Yes, ma'am.

2         MS. FAIR:  Yes, it is true, Mr. Epps did enroll

3  in the Stout Street program.  That is a therapeutic

4  community that is located out in Colorado, Denver.  Before

5  going to Stout Street, he also probably could have gone to

6  another therapeutic community which also has a long

7  residence program, perhaps two to three years, at Delancey

8  House, which is, as I understand it, in Philadelphia, I

9  believe, or some part of --

10        THE COURT:  There is one in New York and there's

11  another one --

12        MS. FAIR:  New York.

13        We were in the process -- and when I say "we,"

14  I'm speaking of Ms. Betsy Biben from the ORD at the Public

15  Defender Service -- of working with Mr. Epps to see if we

16  could get him enrolled in that program, Delancey House.

17        I had talked with Assistant United States

18  Attorney Mr. Howes, and Mr. Howes was able to get Mr. Epps

19  into the Stout Street program, and that is because I

20  believe Mr. Howes has worked with people at Stout Street,

21  and his request was sufficient for Mr. Epps to get into the

22  program without Mr. Epps having to go through the usual

23  admission program which would determine whether or not

24  this was right program for him and whether or not he

25  was r his program.  Those steps were bypassed, so

8

1    none of that happened.

2              If Mr. Epps had waited, as I had wanted him to --

3    and my warning him to wait was solely based on the fact

4    that Ms. Biben had talked with him and had determined,

5    based on information that she had about those two programs

6    and other programs, that Mr. Epps probably was

7    inappropriate for the Stout Street program.  This was

8    information I received from Ms. Biben after I had talked

9    with Mr. Howes and sought his help in terms of helping Mr.

10    Epps find the program.

11              I talked with Mr. Epps, and I said to him, "I

12    believe you need to wait and let us pursue the Delancey

13    program, and if that is not appropriate, then we will go to

14    another program."

15              Mr. Epps was most anxious to go into the Stout

16    Street program because it was a program that Mr. Howes had

17    been able to get him into.  He wanted to go ahead and not

18    disappoint Mr. Howes, and his feeling was, "Let me go.  I

19    think I can make it.  If I can't make it, then I will come

20    back here, I will tell you, I will go to court, and I will

21    tell the court."  That was not the route that I wanted to

22    take.  So     Epps went to the Stout Street program.

23              the time that he arrived, the person in charge

24    of the        who had agreed to take Mr. Epps without

25    any of        ions process, without any of the

9

1   orientation, was not there, and quite frankly, Mr. Epps was

2   not expected.  He was, however, taken into the program, and

3   that was solely on the basis of Mr. Howes' request, his

4   request that they help him take him into the program.

5          Yes, Mr. Epps had difficulty, and I think a lot

6   of the difficulty came from the various peer group

7   interactions.  I guess for lack of a better word, it can be

8   described as raising, where the peers sit around and talk

9   about it.  He had difficulty with that.

10         It is my understanding that the so-called leaving

11  the program occurred when he was on a work site, and

12  apparently there was some controversy, and rather than stay

13  and get into what Mr. Epps considered to be trouble, he

14  just said all right, he left and started walking back to

15  the residence.  Of course, he ended up at the residence.

16  He didn't try to flee, he went right back there.  His bags

17  were packed, and that was because this was considered a

18  violation of the program.  In other words, you don't walk

19  off the work site, you stay there.

20         Technically speaking, Mr. Epps at that point did

21  not have a chance to stay into the program or to leave.

22  His bags had been packed, and he was on his way.  The

23  ticket was purchased for him.  His feeling is that the

24  situation         . that "I did not leave the program, but I

25  had, in          ding to the rules, walked off the site,

1    even though I was headed back to the residence house, and

2    that was a violation.  I was not given another chance."

3    So, yes, that ended the Stout Street program for him.

4            Now, Stout Street gave Mr. Epps a ticket, an

5    airline ticket, to Washington, D.C.  He boarded the plane,

6    came directly back here, called up everyone, including me,

7    and said, "I am back."  He didn't take a detour, he came

8    directly back here.  He got in touch with Probation again.

9            Daily Mr. Epps talked to me about getting a job.

10   This goes to his not having a job at the time that this

11   violation report was written.  My response to Mr. Epps was,

12   "I don't think you need to be out on the street working."

13   This was even though he was involved in the urine

14   surveillance program, and he was also involved in going to

15   the meetings that they have every day, the narcotics

16   meetings.  I think it is Narcotics Anonymous.  He may also

17   have been going to the AA meetings.

18           Finally, Mr. Epps did get a job, and he had

19   already been registered with the CADAC program and was

20   waiting for a bed.  Of course, he was a number along with

21   several other men who were waiting to get into this

22   program.      know that for a fact because I was having

23   almost              ntact with the people at CADAC, a Ms.

24   Singlet              isn't here today, but Ms. Chestnut is here,

25   and sh              sistant to Ms. Singletary.

                                                              11

1          Finally we got Mr. Epps into the program.  At the

2     time that Mr. Epps went into the program, he was clean, he

3     had continued his urine surveillance, and he had also been

4     working because he had gone out and gotten a job on his

5     own, and here he is today.

6          Why do I go through this long saga?  Because I am

7     trying to help the Court understand who Mr. Epps is.  I

8     think that is important.  Mr. Epps is a man who has a drug

9     problem.  He knows that.  Mr. Epps wants to be in

10    treatment.  He was out on the street.  He could have

11    pursued treatment and gotten into a treatment program or

12    waited around until he was picked up.  Or better still, he

13    could have gone elsewhere other than return to this area

14    and say to the Court, "Here I am, I am ready for the

15    hearing."  Moreover, he could have just waited around and

16    not done anything to help himself.

17         Well, that is not Mr. Epps.  Mr. Epps has used

18    his resources to help get himself into a drug treatment

19    program.  He was able to get a job.  He has been clean, and

20    he is now in a program.  If this is not the program that

21    the Court deems appropriate for Mr. Epps -- and the Court

22    may not     it appropriate because it is not the long-term

23    progr.     the Court ordered -- well, Mr. Epps is in

24    trea        is here available for another kind of

25    prog

                                                              12

1      I deemed it necessary for him to be off the

2      street and into at least some kind of therapeutic program,

3      and CADAC appeared to be the program, and it really was not

4      easy getting him in the program when there was this long

5      waiting line.  But we managed it, and here he is today, and

6      Ms. Chestnut is here, and if the Court wishes to have any

7      information about the program, she is available to give

8      that information.

9          We also have in court Mr. Rufus Mayfield, who is

10     with the District Government Human Resources, who has known

11     Mr. Epps for a long, long time, and he is interested enough

12     to come and say please give Mr. Epps another chance.

13         We also have a Mr. Milner here, another

14     upstanding citizen, who is an employee with the United

15     States Department of Energy, and he is here for the same

16     reason, to give some kind of character input to the Court

17     with respect to Mr. Epps.

18         Now, Your Honor, we are very much aware that the

19     last time we were here, the Court gave Mr. Epps a chance,

20     very much aware of that.  But what we want the Court to

21     realize    that Mr. Epps, even though he did not stay in

22     the Stoc.    et program, has not done away with that

23     chance       not want to do something that was

24     irrep.        he walked away.  Maybe that wasn't the

25     thing       his mind it was better to walk away than

13

to do something else which might be worse, and he

considered his walking away not to be leaving the program,

but to be walking away from a situation that he could not

handle and to go back to the residence.

He believes that he can make it at CADAC.  The

people at CADAC believe that they can help him make it.  We

are asking the Court not to take away the opportunity that

the Court gave him when we were here.

THE COURT:  All right.  Mr. Howes?

MR. HOWES:  Who is Larry Epps?  Larry Epps is

talented, Larry Epps is intelligent, Larry Epps is

creative.  Larry Epps is also arrogant and insecure.  Larry

Epps had a chance to go to Stout Street and exchange 12

years to life for two to three years of a program this man

desperately needs.  What did he do?

I got him in Stout Street.  The United States

Government went to bat for Larry Epps because of his

contributions and because we believed Larry Epps could be a

credit to society.  Larry Epps knew where he was going.

Larry Epps wanted to go.  Larry Epps had lots of people

tell him what was expected of him.  He wanted to do it.

It was when he arrived, on the day he

arrived, there ... ...x-up in terms of his arrival.  But

they took Lar ... ito Stout Street based on my

recommendatio ... on the people I have placed there,

14

1    based on my reputation and my say-so.

2              He was there for some 45 days, or 30 days, but

3    before he walks off the job, as Ms. Fair detailed to the

4    Court, the day before I spoke to him on the phone, they

5    called me and said, "We have got a problem," and Larry Epps

6    and I talked on the phone late at night when he called me

7    collect at my house because the program knows before they

8    let him walk out the door, they need to get ahold of me.  I

9    have had some other people in that program who have

10   adjustment problems.  Because once a junky gets into that

11   program and gets off the stuff and realizes that he has to

12   take responsibility for his own life, and because he has

13   got some freedom, because there are jobs and things in that

14   program, gas stations and workhouses and things, he has

15   also got to face the fact that every day he has to work,

16   and every day is not easy.  In that program for the first

17   year, there are programs where people yell at you, people

18   test you, people put you through mind games, all of that to

19   take somebody with a drug treatment program and get them to

20   adjust to the fact that they have to deal with the burdens

21   of that, and they have to deal with the burdens of the

22   world.

23              I    .      ne call from Larry Epps saying, "I

24   can't take .         g-uns yelling at me.  I can't take

25   these young        . . . ng these mind games.  Paul, I don't

                                                          15

1     play games." My point to Larry Epps was, "Larry, if they
2     want you to stand on your head for two years so that you
3     can beat a drug beef, so that you can get your life back in
4     order, and so you don't have to go back to a cage for 12
5     years to life, aren't you smart enough and aren't you
6     intelligent enough and aren't you determined enough to do
7     that," and the next day Larry Epps walks off the site, and
8     they had no choice, because the director called me and
9     said, "Paul, before we had a serious problem, we had to put
10    him on a plane. I couldn't let him stay here."
11           Now, I have had other people call me, and I have
12    had other people go through this. It is not easy. But
13    Delancey Street is no easier.
14           The other side of this coin, Your Honor, is that
15    Larry Epps got a huge break in this Court and a huge break
16    from the United States Government. He got it on one hand
17    because of what he did for the Government, and two, because
18    of what we believed he could be. But, three, he didn't
19    have a choice. The probation -- the sentence of the Court
20    and his agreement with my office was not if I can't make it
21    at Stout Street, I will come back on my own. I'll make it
22    someplace else.           can't make it there, I will make it a
23    third place.            t the agreement.
24           What              to people at Stout Street or
25    Delancey Stre             f the tough programs in this

16

1    country when we say all right, we will give you the chance,

2    Mr. Epps, we will send you to Stout Street, you make it.

3    When he decides that he can't make it, he walks away. What

4    does that say to the rest of the people at Stout Street?

5    Oh, if you don't want to make it here, you go back to

6    Washington and go on with your life?

7          He got there because he has a drug program.  He

8    got there because of his criminal involvement.  And all Mr.

9    Epps had to do was to say, "I will put my arrogance aside,

10    I will put my insecurity aside, and I'll take what they

11    dish out to me for two years and make myself better.  That

12    is the least I can do."

13          What Mr. Epps couldn't stand was some young

14    people in a program who -- they have varying degrees of

15    what counsel called raising -- programs where they do

16    subject the addict, the resident, to some very stringent

17    mind games and some very stringent reality games.  Mr. Epps

18    doesn't like to play games.  Mr. Epps is standing here

19    playing the biggest game of all, and it's a con game.  Mr.

20    Epps is saying, "I am 30 some years old, Your Honor, and if

21    I don't want that program, well, put me in another one."

22    That was not the agreement.

23          This        States Attorney, Assistant United

24    States Attor         go to bat for Larry Epps so that

25    Larry Epps c         is program.  I went to bat for Larry

17

1   Epps because I think he could make it.  But Larry Epps
2   doesn't want to make it, and I think Mr. McNeil's concerns
3   here are that Mr. Epps has yet to tune into the fact that
4   he is a junkie, has been a junkie, spent most of his life
5   in jail, and he doesn't want to deal with that.  There is
6   the problem.  If you let Larry Epps dictate what program he
7   wants, and where he wants to go, and what he wants to do,
8   well, what you have said to other people in programs is you
9   can dictate it yourself; and, two, you've said to Larry
10  Epps you don't have to confront the beast.

11          I believe he can make it, but I also believe that
12  unless it is two to three years of a very, very tough
13  program for him and for other people like him, then we make
14  that whole system silly.

15          THE COURT:  What is your recommendation?

16          MR. HOWES:  We put him back in jail until he can
17  get into Delancey Street.  For me my recommendation was he
18  had his shot.  He walked away from the program.  He has a
19  sentence to serve.  But if the Court deems it appropriate,
20  put him back in jail until Delancey Street will take him.
21  I don't recommend that, but possibly the Court would accept
22  that.

23                      R:  May I be heard, Your Honor?

24                      ES:  If I may finish, Your Honor?

25                      T:  Yes, sir.

                                                        18

1        MR. HOWES:   The Court knows the representations I

2    make -- made for Mr. Epps throughout.  I kept my end of the

3    bargain.  Mr. Epps knew when he left here what was expected

4    of him.  He knew the agreement he got, and he knew the

5    bargain he got.  Mr. Epps has chosen not to make it.

6            THE COURT:  Briefly, Ms. Fair?

7            MS. FAIR:  Your Honor, I think part of the reason

8    Mr. Epps is here before the Court today is because Mr. Epps

9    didn't listen to his attorney, and I am his attorney.  The

10   person Mr. Epps listened to and the person he wanted to

11   please was Mr. Howes.  And I said, "Mr. Epps, Stout Street

12   is not it," because I had done my own investigation, and he

13   ignored me, and he said, "Mr. Howes wants me to do this,"

14   and I said, "It is not your program.  You won't make it

15   there.  Don't go there."  And what he said was, "Mr. Howes

16   wants me to do it."  So, it was more important that he

17   please Mr. Howes, and that is what he sought to do.  It was

18   the wrong program, and that is why he is here today.

19           What I am asking for is for time to be taken to

20   determine which is the program for Mr. Epps.  I think if we

21   are really serious about helping this man and giving him

22   the opportunity,   think that time needs to go into what is

23   the therapeutic    gram, and there are millions of them out

24   here, where we      put this man.  Not any therapeutic

25   program will        any and everybody who has a drug

19

1    problem.

2              As his counsel, now that he is here and has to

3    listen to me, I am asking this Court to follow through on

4    the opportunity that he was given, and I firmly believe,

5    and, in fact, know that there is a program for him, and

6    what I would like to see is for him to stay in the CADAC

7    program six months, until I can have the opportunity, which

8    this Court asked me to do when we were last here, for him

9    to work with his counsel to find that program.  I didn't

10   have the opportunity to do it, and that is what I would

11   like to do, Your Honor, and I think I can do it.

12             MR. McNEIL:  Your Honor, I would like to offer

13   something just briefly.  As Your Honor knows, I work with

14   all the clients that come through the D.C. Superior Court

15   and go to Delancey Street, Stout Street, and all programs

16   around the country, including the programs inner city,

17   CADAC, Rap, Second Genesis.

18             I am here to submit that if leniency is shown

19   once again to this client, that CADAC in six months

20   in-patient and one year out-patient is just as effective as

21   any long-term program.  I work closely with CADAC.  We have

22   almost 70 clients    CADAC.  If he stays in that program

23   and makes himsel     able for treatment and doesn't run

24   out of there and         to treatment, he will begin to

25   change his life        s there.

                                                              20

1          What Probation has come to offer to the court,

2     that since he is in the CADAC program right now, that if he

3     can be allowed to remain in CADAC, and given a review date

4     perhaps in maybe four months or three months to come back

5     and see how he fares since being in there, that we could

6     make a determination at that point.

7          I think this young man is salvageable Your Honor,

8     even though he may not really feel that secure within

9     himself.

10          THE COURT:  I understand.

11          MR. McNEIL:  But he has a serious drug problem,

12    and I think for the first time in his life that he has been

13    he still long enough to understand the seriousness of his

14    drug problem.

15          THE COURT:  Conclude, Mr. McNeil.

16          MR. McNEIL:  That is it.

17          THE COURT:  Is there anything that you want to

18    say on your own behalf, Mr. Epps?

19          THE DEFENDANT:  Yes, Your Honor --

20          MS. FAIR:  If I may just for a moment, Your

21    Honor?

22          THE DEFENDANT:  Inasmuch as I came back to the

23    city ...    't get involved in any drug activity or

24    anyt        ill need a drug treatment program, and I know

25    that        honorable Court will allow me to continue in

                                                  21

1    CAPAC with this program, I would appreciate it.

2              THE COURT:  1988, a conviction for attempted

3    taking property without a right.  1986, burglary in the

4    second degree.  1975, carrying a dangerous weapon, a gun.

5    1984, possession of cocaine.  1978, Bail Reform Act

6    violation.  1978, breaking and entering a vending machine.

7              Now, at the time of the commission of the offense

8    before the Court, you were on parole.  The adjustment

9    reflected on the Pretrial Service report, which was then

10   prepared in connection with your bond status when this case

11   entered the system, described your adjustment on parole as

12   poor.

13             It was with some degree of surprise that I heard

14   the Government articulate strongly in your favor, urging

15   the Court to place you in this program.  I was very pleased

16   to know that a representative of the United States

17   Government can operate in a rational, sensitive, and caring

18   way and not have a knee-jerk reaction to an individual

19   simply because that individual has committed a crime.

20             I gave the Government representations a lot of

21   weight.  I understood not only the value of your

22   participation        other matters that assisted the

23   Government,            ced as well that Mr. Howes was

24   personally             with your potential as an individual

25   who came in            inal justice system in this case with

                                                        22

1    a very long history of offenses against the citizens of the

2    District of Columbia.

3           Juxtaposed against that fact is the fact that you

4    have demonstrated your capacity for doing work, your

5    intelligence.  You have other aspects that strongly

6    suggest, as your lawyer has indicated, that you are

7    salvageable.

8           But the Court cannot order somebody to be

9    motivated.  The Court cannot order somebody to have the

10   guts, the backbone, the fortitude, the temerity, whatever

11   you want to call it, to do the hard thing.

12          This litany of criminal offenses, Mr. Epps, means

13   one of two things.  Either you have been such a bad junky

14   for so long that you cannot control your lawlessness, or

15   you are a premeditated career offender who needs a

16   substantial sentence so that you can be separated from the

17   community.  If it is the former rather than the latter,

18   then no one knows more than you what trouble drugs have led

19   you into.  If it is the former rather than the latter, I

20   cannot imagine more of a powerful force to motivate you to

21   stay out of jail.  It is unimaginable that anyone with this

22   record, knows what they have done, the harm they have

23   inflicted on           individuals and the community, knowing

24   what is fa           knowing that in a highly unusual

25   gesture th          it has joined strongly in insulating

                                    23

your - attempting to insulate you from incarceration, that
you could not muster up the courage, the backbone, the
temerity to deal with the hard task of operating within a
drug program.

You know, when people go into the army, they are
confronted with the same type of thing, and the reason in
that instant is to prepare the individual to do the hard
thing, if necessary die for their country, if necessary
kill for their country. When you go into a drug program,
you are being asked to do the hard thing so that you can go
back out into the community, you can resist the temptations
that surround you, you can deal with the rigors of leading
a successful life from day to day to day, constantly
fighting off that euphoric reference that will never leave
you called drug addiction, and in the same effort keep away
from the kind of lawlessness and harm and damage that you
have done others as well as yourself.

You didn't do it, and what is more your record
suggests, your attitude suggests, everything suggests that
you are not going to do it because fear is obviously not a
catalyst that will move you to function like a man. Fear
is not the catalyst that will move you to function like a
man, and the     and the heartfelt motivation of your
attorney is n     be transplanted into your
backbone.

24

1          You deserve no more chances, and you will get

2    none from me.  The sentence originally suspended is

3    imposed, 12 years to life.

4          MR. HOWES:  Thank you, Your Honor.

5          MS. FAIR:  Good day, Your Honor.

6          (Proceedings concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

1        I, Bruce W. Herzfeld, an Official Court Reporter
2    for the Superior Court of the District of Columbia, in my
3    official capacity, do hereby certify that I reported by
4    machine shorthand the proceedings had and testimony adduced
5    in the case of United States of America versus James
6    Washington, a/k/a Larry D. Epps, case number F-09286-88, in
7    said court on the 26th day of June, 1990.
8
9        I further certify that the foregoing 25 pages
10   constitute the official transcript of the proceedings as
11   taken from my stenographic notes and reviewed with my
12   backup tapes to the best of my ability.
13
14       In witness whereof, I have hereunto subscribed my
     name this 25th day of April, 1991.
15
16
17                              Bruce W. Herzfeld
18                         Official Court Reporter
19
20
21
22
23
24
25



26

Ex (9)

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Criminal Division

UNITED STATES OF AMERICA        :
                                :
            v.                  :
                                :    Criminal No. F 9286-88
JAMES WASHINGTON                :    Judge Wolf
    aka Larry D. Epps           :    Post Conviction Remedy
                                :

## MOTION FOR REDUCTION AND MODIFICATION OF SENTENCE

Defendant, James Washington, aka Larry D. Epps, by and through his attorney, Carrie L. Fair, Esquire, respectfully moves this Court pursuant to Rule 35 of the Court's Rules of Criminal Procedure to reduce the twelve year to life imprisonment sentence previously imposed on defendant. Defendant also requests that the Court modify the present sentence by recommending to the Attorney General of the United States that he serve his sentence at a federal institution.

In support of this motion, defendant states the following:

1.    On August 9, 1988, defendant was charged with the offense of felony murder while armed.

2.    On May 8, 1989, pursuant to a pre-indictment plea offer, defendant entered a plea of guilty to one count of second degree murder while armed before the Honorable Peter H. Wolf.  As part of the plea offer, defendant agreed to assist        government in its prosecution of a co-defendant, Darryl Smith,         case No. F 9938-88.   Thereafter, Criminal Case No. F 1451         be dismissed against defendant.   In addition, the government a          oppose defendant's request, at the time of sentencing, for a feder      nation.

3.    At the senten         ring, on June 23, 1989, as aforesaid, the

- 2 -

Court sentenced defendant to twelve years to life imprisonment.

4.    His counsel, (then Shirlimarie M. McAroy-Gray, Esquire) again advised the Court of defendant's agreement to assist the government and of his desire to serve his sentence at a federal institution.  The Court declined to give defendant a federal designation until such time as he had completed his obligation to the government.

5.    Since being sentenced in this matter, defendant has prepared to fulfill his obligation under the plea agreement.  He was ready, willing and able to testify for the government against Darryl Smith on August 28, 1989.  Unfortunately, the co-defendant Smith was granted a continuance on the day of trial.  A new trial has been scheduled for the end of November, 1989.

6.    Pursuant to rules of this Court, a motion seeking the reduction and modification of a previously imposed sentence must be filed within 120 days after sentencing.  Therefore, defendant is seeking a reduction of his sentence and in addition, a modification of his sentence, that is designation to a federal institution.

7.    Defendant truly desires a chance at rehabilitation.  It is his considered opinion that this can only be achieved at a federal institution which provides a wider ... .y of rehabilitative services.  Because of this superiority of services an .        disparity between the District of Columbia parole guidelines an<       f. .al parole guidelines, defendant, by serving his sentence at a        .. .itution, would not gain the benefit of the Good Time Credit Act o.    ..  pre-parole release provisions provided under the District of (       parole guidelines.  Thus, he would virtually have to serve all of        imposed by this Court.  With that awareness defendant

- 3 -

seeks a modification of his sentence so that he can, in tandum, receive the benefits of a federal institution during his incarceration.

8.    Defendant also requests a hearing on this matter and prefers to have the hearing set for early December 1989, after the completion of co-defendant Darryl Smith's trial, which is now scheduled for the end of November, 1989.

WHEREFORE, for the above-stated reasons and for such other reasons as may appear at a hearing on this Motion, defendant respectfully requests a reduction and a modification of his sentence.

Respectfully submitted,

Carrie L. Fair, Esquire        048884
Attorney for James Washington aka
 Larry D .Epps
1025 Connecticut Avenue, N.W.
Suite 700
Washington, D. C. 20036
(202) 785-2442

## CERTIFICATE OF SERVICE

I he____ ____y that a copy of the foregoing Motion was this 20th day of Octob. ____ .iled, first-class, postage prepaid, to Charles Cobb, Esquire, ____ .es, Esquire, Office of the United States Attorney, 555 4th Stre. ____ .hington, D. C. 20001.

Carrie L. Fair, Esquire

Ex. (8)

SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION - FELONY BRANCH

UNITED STATES OF AMERICA       :    Criminal Case No. F9286-88

    v.                             :
                                   :
JAMES WASHINGTON               :    Judge Ricardo M. Urbina
(AKA LARRY EPPS)               :
                                   :
                                   :    Sentencing: 4-9-90

MAR 16   9 35 AM '90

FILED

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION FOR REDUCTION & MODIFICATION
OF SENTENCE

The United States, through its attorney, the United States
Attorney fore the District of Columbia, makes the following re-
presentations in response to defendant's motion for a modifi-
cation and reduction of sentence.

1. The defendant entered a plea in the case before this Court
in exchange for the government's dismissal of murder charges in a
second case, contingent upon the defendant testifying truthfully
under oath at the trial of the second matter (United States v.
Darryl J. Smith, F9938-88). The latter was tried before Judge
Weisberg beginning on February 20, 1990.

2. The government wishes to make specific representations
at the bench concerning aspects of Mr. Epps's cooperation.

3. The government not oppose federal designation; in
fact, the government that Mr. Epps will benefit from
training programs federal system. Moreover, in light
of these matters, welfare is best assured outside
this jurisdiction

4. The government believes Mr. Epps has the intelligence,
talents, and skill a productive and creative member of
any community, prison or in the community. He has

-2-

This is the final opportunity for Mr. Epps to decide whether his extensive artistic talents and business skills will be show cased behind bars or behind windows. The government believes that Mr. Epps has the capacity to be a useful and non-violent member of the community.

5. Investigation of the case before this Court shows that Mr. Epps was faced with limited choices. While finding no basis for a legitimate self-defense claim, given Mr. Epps's criminal (drug-related) activities, he would have been the victim had he not killed the decedent in his case. Extensive informant data and investigation by a special task force shows that the man Mr. Epps killed had a contract on Mr. Epps's life and planned to kill Mr. Epps -- and he would have, but Mr. Epps acted first.

6. The government in no way condones Mr. Epps's criminal violence and drug-related conduct. Mr. Epps is a mature, talented, and very intelligent man with the ability to make the right choices in his life. He is the first to explain -- but not attempt to excuse -- his criminal record with one word: cocaine. Mr. Epps educated and advised several young government witnesses that their choices could and would lead them to the same plight he faces unless they change their ways: not talk, just commitment. Mr. Epps played an instrumental role in the strategic decisions reached in the Smith a role he was not required in any way to play under event. But he was truthful and provided a crucial link in turning the government's theory into an explanable and logic case of premeditated murder, with fact and circumstance that only Mr. Epps could provide.

-3-

7. The government does not mitigate the fact that Mr. Epps took another man's life, but in all candor -- within the realm of drug dealing -- Mr. Epps was a marked man by a New York/Jamaican group and he came within moments of being murdered. In light of Mr. Epps's cooperation -- well beyond what was required under his agreement, as he served literally as a role model for young witnesses in what they could well become unless they were truthful with themselves about their own addictions and choices -- the government joins in the defendant's request for a reduction of sentence and a federal designation for the remainder of his time. The government wishes to reserve further representations at the bench during the hearing on this matter.

Respectfully submitted,

JAY B. STEPHENS
UNITED STATES ATTORNEY

G. PAUL HOWES
ASSISTANT UNITED STATES ATTORNEY

IFICATE OF SERVICE

I hereby ce           a copy of this motion was mailed to
the defendant, a      ngton (aka Larry Epps), P.O. Box 25,
Central Facility      Va., 22199, and to his counsel, Carrie
L. Fair, Esq.,        Avenue NW., Suite 700, Washington, D.C.
2  936, this 16t      March 1990.

G. PAUL HOWES
ASSISTANT UNITED STATES ATTORNEY

Ex (10)

SUPER    COURT OF THE DISTRICT OF )LUMBIA

CRIMINAL DIVISION    —    FELONY BRANCH

UNITED STATES OF AMERICA        :
                                :    Criminal Case No. F9286-88    3 59 17 '90
            V.                  :
                                :    Judge Urbina
                                :
LARRY D. EPPS                   :    Closed
(aka JAMES WASHINGTON)          :

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RECONSIDERATION AND MODIFICATION OF SENTENCE

The United States, through its attorney, the United States Attorney for the District of Columbia, opposes defendant's motion for reconsideration and modification of sentence, and offers the following points, authorities, and representations:

1. Defendant plead guilty to second degree murder in a separate case on May 8, 1989. In June 1989 he was sentenced by Judge Wolf to serve 12 years to life in prison. This case, F9286-88, was dismissed by this prosecutor, as part of the plea arrangement in the separate case, upon the condition that the defendant testify truthfully at trial as a government witness against Darryl Smith, charged in the stairwell execution of Billy Wilson on August 2, 1988 inside a high-rise at 5929 East Capitol Street Southeast.

2. Defendant w    prepared to testify in the Darryl Smith murder trial although he was t    ed by the prosecutor. However, it should be noted that defendant d    all the prosecutor the full truth about the mur- der until the t    t trial, at the same time the defendant offered his gratuitous     ions for trial strategy and witness preparation.

3. In lig    defendant's assistance to the government in the Smith murder c    because the prosecutor believed that the defendant wa talented,    gent, and finally at an age when he could decide to