C O V E R

**NOTICE:** The attached document is a newspaper article from The Washington
Times dated, June 02, 1995. (IB)

Washington Times, June 2, 1995        Pg. A-14
Paul Craig Roberts

## "Cut-Off of Legal Ethics at Justice?"

The U.S. Justice Department has shown itself of legal ethics that hinder its ability to get convictions, and Deputy Attorney General Jamie S. Gorelick is proud of it. The problem with ethics, says Mr. Gorelick, is that "they actually hinder the department's lawful ability fully to carry out its enforcement mission." Well, Jamie, so do the rules of evidence and Habeas Corpus. Are they next?

The Universal ethical norm from which the federal government has disassociated itself is designed to prevent those trained in law from taking advantage of those who aren't. A requirement in all 50 states and one of the American Bar Association's model rules of professional conduct, the rule says it is unethical to communicate directly with suspects in the absence of their lawyer. What it boils down to is the time-honored principle to have your lawyer present. In the sixth amendment of the constitution, it is the right "to have Assistance of Counsel."

The Justice Department's prosecutors have found it is easier to trap people or frame them, if their lawyer is not present. In 1934, Supreme Court Justice George Sutherland said the obligation of the Justice Department "is not that it shall win a case, but that justice shall be done." This is regarded as bunk today by Justice Department lawyers who know that their careers depend on conviction rates.

In August 1994, The Justice Department made it clear that when ethical rules get in the way of careers, the rules are expendable. The department issued a regulation that permits U.S. prosecutors to communicate with defendants in the absence of their lawyers. Soon we will be back to beating suspects into confessions.

It is tempting to blame the Clinton Administration unethical at its core for this jurist of legal ethics. However, the policy first reared its depraved head in the Bush Administration where it was looked upon favorably by "law and order conservatives" willing to dampen the crime wave with a policy of conviction at all costs.

Many republicans go along with this policy of creating an elite corps of federal prosecutors who are above (ethics) and exempt from judicial control.

Increasingly, federal judges are dismayed by prosecutorial misconduct and the refusal of the Justice Department to take disciplinary action even in cases when judges file written findings of misconduct. Suborning perjury and withholding exculpatory evidence are becoming routine methods of conviction. In a notorious 1993 case, federal judges overturned convictions that federal prosecutors had obtained through the use of alcohol, drugs, sex and perjured testimony. Senior defense attorneys say they now see more cases of government misconduct in one year than they formally saw in a lifetime. States are not rolling over dead for The Department of Justice or Justice Department's assertion of ethical immunity.

On May 19, a U.S. Appeals Court thwarted what the Legal Times calls "the

justice department's six year battle to shield federal prosecutors from the scrutiny of state bar authorities." The ruling permitted New Mexico State disciplinary actions to proceed against Assistant U.S. Attorney G. Paul Howes for directly communicating with a murder suspect without the consent of the suspect's lawyer.

The Justice Department argues it has the right to water down the ethical rules for it's attorneys and that the supremacy of federal law over state law protects its attorneys from interference when they violate the legal standards imposed by states. In other words, the federal prosecutor can fight dirty in court, but defendant's attorneys is bound by strict ethical norms.

As Associate Deputy Attorney General Seth Waxman puts it, federal prosecutors must be protected from sanctions when they don't follow the same rules that everyone else has to follow.

As the forces line up in this battle, it is clear that the struggle is between proponents of big government and the proponents of federalism.

If Senate Republicans really believe in the federalism on which they based their balanced budget plan, they will delete their crime bill provision that makes federal prosecutors a special class that is unaccountable under the ethical standards that govern legal conduct.


Paul Craig Roberts is a columnist for The Washington Times and is nationally syndicated.

Dec 28/2007

## PAUL CRAIG ROBERTS

# Cut-off of legal ethics at Justice?

The U.S. Justice Department has shown itself of legal ethics that hinder its ability to get convictions, and Deputy Attorney General James S. Gorelick is proud of it. The problem with Ms. Gorelick, is that they actually hinder the department's law enforcement mission. "Well, Jesse, so do the rules of evidence. Are they next?"

The universal ethical norm from which the federal government has dissociated itself is designed to prevent those trained in law from taking advantage of those who aren't. A requirement in all 50 states and one of the American Bar Association's Model Rules of Professional Conduct, the rule says it is unethical to communicate directly with a person in the absence of his lawyer. When a person is held by police, he has a right to demand the presence of a lawyer present. In the Sixth Amendment to the Constitution, we will be back to forcing suspects to make confessions.

The Justice Department's prosecutors have found it is easier to run people, or frame them, if their lawyer is not present. In 1994, Supreme Court Justice George Sutherland and the obligation to flush administration, there it was looked upon (privately) by "law and order conservatives" willing to pull



bunk today by Justice Department lawyers who know that their careers depend on conviction rates.

In August 1994, the Justice Department made clear that where ethical rules interfere with careers, the rules must go. The department unilaterally exempted its prosecutors from the ethical standard that prevents U.S. prosecutors from communicating with defendants in the absence of their lawyers. Sean into confessions.

It is tempting to blame the Clinton administration, but as it is local as it is ethics. However, the story first reared its depraved head in the Bush administration...

ty of criticism at all costs. Many Republicans go along with the policy of treating an elite corps of federal prosecutors who are above ethics and exempt from judicial control.

Increasingly, federal judges are dismayed that prosecutorial misconduct and the refusal of the Justice Department to take disciplinary action even in cases where judges find Brady violations of misconduct. Subornation of perjury and withholding of exculpatory evidence are becoming routine. In a 1992 case, federal judges published findings that federal prosecutors had obtained convictions through the use of alcohol, drugs, and other inducements to give false testimony. Senior Justice Department attorneys say they now see what they formerly denied — if only once or twice they former-ly saw it in a lifetime.

States are not ruling over one deal for the Justice Department's assertion of ethical immunity.

On May 19, a U.S. Appeals Court invented what the Legal Times calls "the Justice Department's six-year battle to shield federal prosecutors from the scrutiny of state ethics codes." The ruling permitted New Mexico state disciplinary actions to proceed against Assistant U.S.

...

Attorney General Reno's prosecution go along with the policy of treating a suspect without the consent of the suspect's lawyer.

The Justice Department argued it has the right to wipe down the ethical rules for it attempts and over state law protects the attorney from interference when they violate the legal standards imposed by states. In other words, the federal prosecutor can fight dirty in court, bound by strict ethical norms. As Associate Deputy Attorney General Seth Waxman put it, federal prosecutions must be protected from the same rules that everyone else has to follow.

As the break line up in this battle, between proponents of high government and the proponents of federalism. If Senate Republicans really believe in the federalism on which they based their balanced budget plan, they will delete their crime bill provision that makes federal prosecutions unaccountable under the ethical standards that govern legal conduct.

---

*Paul Craig Roberts is a columnist for The Washington Times and is nationally syndicated.*



BP-s187.058                          **Progress Report**

| **U.S. Department of Justice** | **Federal Bureau of Prisons** |
|---|---|
| Institution:<br>USP, Atlanta, Georgia | Date:<br>August 4, 2002 |

**Inmate Review**

| | | |
|---|---|---|
| _____<br>Inmate Signature | _____<br>Date | *T. Masters*<br>Staff Signature |

1. Type of Progress Report

   Statutory Interim

| 2. Inmate Name:<br><br>Epps, Larry D. | 3. Register Number:<br><br>36966-118 | 4. Age (DOB):<br><br>46(10-13-1955) |
|---|---|---|

5. Present Security/Custody Level:

   **High/In**

6. **Offense**/Violator Offense: Murder Second Degree

7. Sentence: DC GTCA Adult Sentence, Life, 12 Year Minimum Term, $250.00 Felony Assessment.

| 8. Sentence Began:<br><br>06-26-1990 | 9. Months Served +<br>   Jail Credit:<br><br>145 Months. + 181 JCT | 10. Days GCT/EGT/SGT:<br><br>0/0/1440 |
|---|---|---|
| 11. Days FSGT/WSGT/DGCT:<br><br>0/0/0 | 12. Projected Release:<br><br>Life | 13. Last USPC Action:<br><br>May 7, 1997 |

14. Detainers/Pending Charges:

    There are no known detainers or pending charges.

15. Codefendants: None

copy:    Inmate file
         Inmate
         USPO
         U.S. Parole Commission (if applicable)

BP-s187.058 Progress Report
2

**U.S. Department of Justice**
Inmate Name: Epps, Larry D.                    Reg. No: 36966-118

**Federal Bureau of Prisons**
Date: August 4, 2002

16.    Institutional Adjustment:

a.    Program Plan: Mr. Epps's initial classification was held at USP Atlanta, Georgia, on
October 16, 2001. At Mr. Epps's initial classification and subsequent program reviews, the Unit
Team's recommendations were: participation in educational and vocational programs; establish a
payment plan for his court-ordered monetary obligations; and participation in counseling groups and
educational programs. Mr. Epps did complete the A&O Program. He participated in some of the
recommended programs.

b.    Work Assignments: Mr. Epps's current job assignment is Mail Bag Bench work detail. He works
approximately 7 hours a day, five days a week, is pay grade 1, and received approximately $160.00 per
month. Mr. Epps's work responsibilities include making repairs on mail bags by sewing patches onto
damaged areas on the mail bags. His work evaluations reflect that he does outstanding work. He is
noted as being dependable and a very quick learner. Other job assignments include: Ground
Maintenance work detail; Labor One PM work detail; D/Lobby Orderly work detail; Food Service
work detail; Auto Mechanics work detail; and Special Education work detail.

c.    Educational/Vocational Participation: Mr. Epps has met all mandatory educational requirements. Mr.
Epps has received his General Education Development (GED). In addition to the GED, Mr. Epps has
completed the following educational programs: Data Entry; Microcomputer Applications Level 1;
Microcomputer Applications Level II; and Vocational Training Level 1. Mr. Epps in not participating
in any educational programs at this time.

d.    Counseling Programs: Mr. Epps has been referred to his Unit Counselor for any counseling needs.
Mr. Epps has completed the Substance Abuse Treatment Program and the counseling group
Commitment to Change. He is currently participating in: Victim Impact Group; 40 Hour
Drug/Alcohol Program; and counseling with the Psychology Department on an as needed basis.

e.    Incident Reports: Mr. Epps has maintained clear conduct.

f.    Institutional Movement: Mr. Epps arrived at USP Atlanta, Georgia, from the D.C. Department of
Corrections on September 25, 2001. There has been no further institutional movement.

g.    Physical and Mental Health: Mr. Epps is assigned a regular duty status with the medical restrictions of
no Food Service work and lower bunk requirement. According to Mr. Epps' Presetence Investigation
Report, Mr. Epps was diagnosed with hepatitis when he was approximately 13 years old. Mr. Epps
appears mentally and emotionally stable.

h.    Progress on Financial Responsibility Plan: At the time of sentencing, in the Superior Court of the
District of Columbia, imposed a $250.00 felony assessment. Mr. Epps has completed payment of his
monetary obligation.

BP-s187.058 Progress Report
3

**U.S. Department of Justice**                                    **Federal Bureau of Prisons**
Inmate Name: Epps, Larry D.              Reg. No: 36966-118              Date: August 4, 2002

17.  Release Planning:  Upon release Mr. Epps intends to reside in the Berkeley, California area.  Offender is subject to notification under Public Law 18 USC 4042(b), the Violent Crime Control and Enforcement Act of 1994 due to his conviction of a violent crime.  He was notified on October 16, 2001.

   a.  Residence:       Howard McDonough (Friend)
                         2996 Adeline Street.
                         Berkeley, California 94703
                         510-665-4330

   b.  Employment:  To be established.

   c.  USPO:           Sharon Mayes-Jacks, SCSO
                         Room 2010
                         300 Indiana Avenue
                         Washington, D.C. 20001

   d.  Release Preparation Program:  Mr. Epps will be encouraged to completed the Pre-Release Preparation Program prior to his release.

18.  Dictated By: _____
                   T. Masters, Case Manager

19.  Date Typed:   August 4, 2002

20.  Reviewed By: _____
                   E. Stewart, Unit Manager

O MOS

U.S. District Court

J.S. District Court for the Northern District of Georgia (Atlanta

CIVIL DOCKET FOR CASE #: 03-CV-271

Epps v. Wiley                                              Filed: 01/29/03
Assigned to: Judge Charles A. Pannell
              Referred to: Mag Judge C. Christopher Hagy
Demand: $0,000                          Nature of Suit: 530
Lead Docket: None                       Jurisdiction: US Defendant

Cause: 28:2241 Petition for Writ of Habeas Corpus (Federal)


LARRY D. EPPS                    Larry D. Epps
      plaintiff                  #36966-118
                                 [COR LD NTC] [PRO SE]
                                 USP Atlanta
                                 P.O. Box 150160
                                 601 McDonough Boulevard, S.E.
                                 Atlanta, GA 30315
                                 404-635-5100


      v.


RON WILEY, Warden                Robert David Powell
      defendant                  404-581-6004
                                 [COR LD NTC]
                                 Office of United States
                                 Attorney
                                 Northern District of Georgia
                                 75 Spring Street, S.W.
                                 600 United States Courthouse
                                 Atlanta, GA 30335
                                 404-581-6000

Proceedings include all events.
1:03cv271 Epps v. Wiley

0 MOS

1/29/03   1       PETITION FOR WRIT OF HABEAS CORPUS. (aet)
                  [Entry date 02/03/03]

1/29/03   2       MOTION by plaintiff to proceed in forma pauperis with
                  brief in support. (aet) [Entry date 02/03/03]

1/29/03   --      CASE REFERRED to Mag Judge C. C. Hagy  (Calendar sheets
                  forwarded) (aet) [Entry date 02/03/03]

2/3/03    --      SUBMITTED to Mag Judge C. C. Hagy on [2-1] motion to
                  proceed in forma pauperis (aet) [Entry date 02/03/03]

3/3/03    3       ORDER by Mag Judge C. C. Hagy GRANTING [2-1] motion to
                  proceed in forma pauperis, directing clerk to perfect
                  service of petition and order on respondent by certified
                  mail, with copy to U.S. Attorney, directing Ron Wiley to
                  show cause within 30 days why petition should not be
                  granted,  [3-1] order to be submitted on 4/7/03 (cc) (cdg)
                  [Entry date 03/05/03]

3/3/03    --      Terminated submissions. (cdg) [Entry date 03/05/03]

3/13/03   --      Acknowledgement of receipt of [3-1] order by U.S.
                  Attorney's Office. (cdg) [Entry date 03/13/03]

4/9/03    4       Response by defendant to [1-1] habeas corpus petition with
                  exhibits ***EXHIBITS TO RESPONSE FILED UNDERSEAL*** (cdg)
                  [Entry date 04/11/03]

8/27/03   --      Copy of docket sent to pla per correspondence request. (cdg)
                  [Entry date 09/05/03]

FILED IN CHAMBERS
U.S.D.C. Atlanta

OCT 0 7 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LARRY D. EPPS,          :
     Petitioner,        :       PRISONER HABEAS CORPUS
                        :       28 U.S.C. § 2241
     v.                 :
                        :       CIVIL ACTION NO.
                        :       1:03-CV-0271-CAP
R. WILEY, Warden,       :
     Respondent.        :
                        :

### ORDER FOR SERVICE OF REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Attached is the report and recommendation of the United States Magistrate Judge in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's Civil Local Rule 72. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the report and recommendation within ten (10) days of service of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. If no objections are filed, the report and recommendation may be adopted as the opinion and order of the District Court and any appellate review

AO 72A
(Rev 8/82)

of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093 (11th Cir. 1983), cert. denied, 464 U.S. 1050, 104 S. Ct. 729, 79 L. Ed. 2d 189 (1984).

The Clerk is **DIRECTED** to submit the report and recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED**, this _7__ day of _October_, 2003.

C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE

2

FILED IN CHAMBERS
U.S.D.C. Atlanta

OCT 07 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

LARRY D. EPPS,                    :
      Petitioner,           :       PRISONER HABEAS CORPUS
                     :       28 U.S.C. § 2241
      v.                       :
                     :       CIVIL ACTION NO.
                     :       1:03-CV-0271-CAP
R. WILEY, Warden,                 :
      Respondent.           :

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Petitioner, Larry D. Epps, an inmate at the United States Penitentiary in Atlanta, Georgia, has submitted the instant habeas corpus petition pursuant to 28 U.S.C. § 2241 seeking to challenge the denial of his parole. The matter is currently before the Court on the petition [Doc. 1] and the answer-response [Doc. 4].

I.    Factual Background and Procedural History

On March 11, 1986, Petitioner entered a guilty plea to Burglary II in the District of Columbia ("D.C.") Superior Court and was sentenced to a term of 2-6 years. [Respondent's Exhibit (hereinafter "RX-") 2]. On August 19, 1987, Petitioner was released on parole subject to parole supervision. [RX-3]. The D.C. Parole Board ("the Board") imposed a special condition of Petitioner's parole that he be monitored for narcotics use. [RX-4].[1]

---

[1] Petitioner's urine tested positive for cocaine four times during the course of his supervision. [RX-4].

On March 10, 1988, Petitioner was arrested and charged with Burglary II, which was reduced to attempted taking of property without rights, for which he was sentenced to sixty (60) days of work release.  [Id.].  Following that conviction, on July 28, 1988, the Board issued a parole violator warrant for Petitioner's arrest.  [RX-5].

Petitioner was arrested on August 9, 1988, on the parole violator warrant, but he was also charged with a new criminal offense of felony murder while armed.  [RX-6].  On November 4, 1988, the Board revoked Petitioner's parole for the Burglary II conviction.  [RX-9].  On June 23, 1989, Petitioner entered a guilty plea to second-degree murder and was sentenced to a term of twelve (12) years to life.  [RX-8].  On November 2, 1989, the Board again granted parole to Petitioner on the Burglary II conviction so that he could begin to serve the consecutive sentence for second-degree murder.  [RX-10].

On November 30, 1995, Petitioner applied for early medical parole.  [RX-11].  Noting that Petitioner's parole eligibility date was October 8, 1997, the D.C. Department of Corrections ("DCDOC") found that although Petitioner has been diagnosed with ~~_____~~ he had not had any major infections and was able to perform the functions of daily living.  [RX-12].  The DCDOC noted some positive programming completed by Petitioner, but also cited his two disciplinary reports for possession of

2

contraband, and two positive urinalysis reports for marijuana. Thus, the DCDOC concluded that Petitioner had not met the criteria for medical parole and recommended that his request be denied. [Id.]. Adopting the recommendation of the DCDOC [RX-12], on February 1, 1996, the Board issued an order ███████ ████████████. [RX-13].

On April 23, 1997, the Board conducted an initial parole hearing regarding Petitioner's eligibility for parole. [RX-14]. Petitioner's point score indicated that parole should be denied. [Id. at 7]. The Board determined that parole should be denied and that, ██████████████████████████████████, Petitioner needed a lengthy set-off for reconsideration. [Id. at 10]. The Board ordered that Petitioner be reconsidered for parole by October 2, 2002. [RX-15]. Special instructions for reconsideration were provided by the Board in its order, including program participation, work detail, no new disciplinary reports, psychological counseling, and an intensive drug/substance abuse program. [RX-15].

In February, 1999, Petitioner submitted another application for medical parole, which was reviewed by the United States Parole Commission ("the Commission").[2] [RX-17]. The Commission

---

[2] Pursuant to the National Capital Revitalization and Self-Government Improvement Act, the Commission assumed the responsibility of making parole release determinations for all eligible D.C. Code offenders on August 5, 1998. Pub. L. No. 105-33, § 11231(a)(1), 111 Stat. 712, 745. See D.C. Code § 24-

3

noted that Petitioner had not submitted a medical report from his institution as required by 28 C.F.R. § 2.77. The Commission found that even if the medical condition as stated by Petitioner was true, Petitioner was not eligible for medical parole because given the seriousness of his offense there was no reason to believe that his medical condition would render him incapable of committing more violent acts. [RX-18]. As such, on March 2, 1999, Petitioner's request for medical parole was denied. [RX-19].

On September 23, 2002, Petitioner received a rehearing for consideration of parole. [RX-20]. The hearing examiner reviewed Petitioner's institutional performance, found that Petitioner had "continued to program well" and awarded Petitioner a one-point deduction for such performance (or "programming"), thus enhancing his chances for parole. [Id. at 2]. The hearing examiner also reviewed a psychological report, which indicated that Petitioner had made little progress in obtaining individual therapy. [Id. at 1].

At the hearing, Petitioner denied that he committed second-degree murder and claimed that he shot the victim in self-defense. [Id. at 2]. Petitioner claimed that the reason that he pleaded guilty to second-degree murder was because the authorities had indicted him on another murder in which he had

---

131 (2001).

4

been present in the area but had not actually witnessed, and he was convinced to accept the plea agreement so that the charges against him in the other murder case would be dropped. [Id.].

The hearing examiner noted that although Petitioner had programmed well, the fact remained that he took someone's life and remained a serious risk. [RX-20 at 3]. While Petitioner's point score indicated that he should be released on parole, the hearing examiner recommended departing from the guidelines and denying parole because Petitioner had a previous history of burglaries and possessing a weapon, and used a weapon to commit the instant offense to take a life. [Id.]. The Commission adopted this recommendation and, on October 8, 2002, denied parole to Petitioner and scheduled a rehearing for consideration of his parole for September, 2003. [RX-22].

Thereafter, on December 5, 2002, Petitioner requested that his case be reopened. [RX-23]. Petitioner argued that he should have received more points for program achievement, that departure from the guidelines was not warranted, and that he should be released based on his medical condition. [Id.; RX-24]. By letter dated March 17, 2003, the Commission denied Petitioner's request to reopen his case, stating that the programming issues and guideline departure were considered at the time of Petitioner's hearing, and that Petitioner's request

5

for a more lenient decision based on the health issues were inadequately documented. [RX-25].

Petitioner filed the instant habeas corpus action on January 29, 2003. Herein, Petitioner claims that: (1) the Commission's decision was arbitrary and capricious because it relied upon the same factors used by the Board to depart from the guidelines and deny parole, thereby improperly engaging in "double counting;" (2) Petitioner should have been granted parole because he successfully completed the special instructions required by the Board prior to his reconsideration date; (3) the Commission used deceptive language to confuse the underlying prior criminal convictions used to deny parole; and (4) the Commission should have granted parole based on medical reasons.[3] [Doc. 1].

II. Discussion

A. Standard of Review

This Court's role in reviewing decisions by the Board and the Commission on application for a writ of habeas corpus is limited to whether the Board or Commission acted arbitrarily or capriciously or abused its discretion. See Dye v. United States Parole Comm'n, 558 F.2d 1376, 1378 (10th Cir. 1977) (stating

---

[3] Petitioner mentions that he has Hepatitis C, Diabetes, and a liver ailment. [Doc. 1 at 2]. Petitioner does not mention that he has ████████ as discussed in the Board's previous decision to deny medical parole.

6

that standard of review of action by the Commission is whether the decision is arbitrary and capricious or is an abuse of discretion); accord, Solomon v. Elsea, 616 F.2d 282, 290 (7th Cir. 1982); Billiteri v. United States Bd. of Parole, 541 F.2d 938 (2d Cir. 1976). See also Duckett v. United States Parole Comm'n, 795 F. Supp. 133, 135 (M.D. Pa. 1992) (stating that the Board has broad authority over parole decisions and judicial review is limited to whether the Board acted arbitrarily or capriciously or abused its discretion). The appropriate standard of review of the Commission's findings of fact "is not whether the [Commission's decision] is supported by the preponderance of the evidence, or even by substantial evidence; the inquiry is only whether there is a rational basis in the record for the [Commission's] conclusions embodied in its statement of reasons." Zannino v. Arnold, 531 F.2d 687, 691 (3d Cir. 1976).

B. The Commission Did Not Engage in Impermissible "Double Counting."

Petitioner argues that the Commission engaged in impermissible "double counting," because it allegedly "relied upon the same factors used by the Board in the ('early initial') parole hearing for determining the guidelines range used in a rehearing to again depart from the guidelines[.]" [Doc. 1]. Double counting occurs when the Commission uses the same factor in scoring a ~~Petitioner~~ pursuant to the guidelines and as an

7

aggravating factor justifying a decision above the guidelines.[4] Kell v. United States Parole Comm'n, 26 F.3d 1016, 1020 (10th Cir. 1994); Romano v. Baer, 805 F.2d 268, 271 (7th Cir. 1986); Harris v. Martin, 792 F.2d 52, 54 (3d Cir. 1986). Double counting does not occur, however, if the particular nature of the crimes or the severity thereof is used as an aggravating factor to depart from the guidelines. See e.g., Romano, 805 F.2d at 271; Solomon v. Eisea, 676 F.2d 282, 287 (7th Cir. 1982); see also Maddox v. United States Parole Comm'n, 821 F.2d 997, 1001 (5th Cir. 1987) (the Commission may consider the nature of petitioner's prior offenses to support its decision); DiCaro v. Perrill, No. 94-1557, 1995 WL 607622 at *2 (10th Cir.

---

[4] This Court interprets Petitioner's "double counting" argument as a claim that the Commission improperly used the same factors to depart from the guidelines as the Board used to calculate Petitioner's original guideline score. Respondent appears to interpret Petitioner's argument as a challenge to the Commission's use of the Board's previous calculated score in the first instance. To the extent that Petitioner's argument challenges that use, it appears to rest on the fact that once the Board made an initial parole decision, any factors used by the Board could no longer be used for future consideration of parole. This argument misunderstands the function of the Board and the Commission. Indeed, the very nature of a parole reconsideration decision involves reviewing the totality of events and circumstances from the time a potential parolee was convicted -- and necessarily includes reviewing the same factors that were analyzed in the initial parole decision. Such review certainly accords with the Commission's parole regulations. See Brown, 2003 WL 194206 at *3. Thus, the fact that the Commission used the same factors upon which the Board relied in calculating Petitioner's score is not arbitrary, capricious, or an abuse of discretion.

Oct. 16, 1995) (the Commission is allowed to rely on pattern, repetition, and nature of previous offenses to justify a decision above the guidelines); Bialkin v. Baer, 719 F.2d 590, 594 (2d Cir. 1983) (the Commission is not precluded from considering number, nature, and frequency of prior and current offenses). Here, while the Commission considered the number of Petitioner's previous convictions and the fact that he used a weapon in calculating his initial guideline range, the Commission determined that the severity of Petitioner's crime (i.e., murder) and his risk to society were not adequately taken into account by that guideline range.

According to the presentence report for the second-degree murder conviction, the police responded to a shooting and observed a black male lying on the living room floor with a gunshot wound to the head.[5] [RX-7]. A witness reported that he was present at an apartment with Petitioner and two other individuals, the victim and someone named Lawrence.[6] [RX-7]. Petitioner and Lawrence were in the bedroom with the door closed while the witness and the victim were in the living room. [Id. at 3]. The witness went into the bathroom to splash cold water

---

[5] The presentence report is filed under seal.

[6] The presentence report does not specify whether the witness was male or female. For ease of reference, this Court will refer to the witness as a male.

9

on his face.[7]  [Id.].  After approximately five or ten minutes, the witness heard a gunshot.  [Id.].  He exited the bathroom and observed the victim lying on the floor unconscious with Petitioner and Lawrence standing over the victim's body.  [Id.]. Lawrence ran into the bedroom and Petitioner, who was armed with a handgun, ran toward the witness.  [Id.].  The witness ran into the bathroom, Petitioner apparently followed him, and they engaged in a struggle over the gun.  [Id.].  The gun discharged during the struggle, after which the witness managed to push Petitioner out of the bathroom into the bedroom where the witness observed Lawrence reach behind the bed and produce a second gun.  [Id].  The witness pushed Petitioner onto the bed, ran out of the bedroom slamming the door behind him, ran into the bathroom, closed the door, and jumped out of the third floor window.  [Id.].  A second witness reported hearing two gunshots and observed two subjects running out of the building armed with guns.  [Id.].

Petitioner's version of the events was that he had to kill the victim or the victim would have killed him.  [RX-7 at 13]. Petitioner claimed that "the way of the street" and "the way things are" in the drug community is "that you take someone out before they take you out."  [Id.].

---

[7] The presentence report states that the witness went into the bedroom, but it appears that the witness actually went into the bathroom.

10

The Court notes that the statute and regulations are worded in discretionary terms. <u>See</u> D.C. Code § 24-204(a) ("[T]he Board <u>may</u> authorize [a prisoner's] release on parole . . . .") (emphasis added); <u>Brown v. United States Parole Comm'n</u>, No. 02 Civ. 7639 (NRB), 2003 WL 194206 at *3 (S.D.N.Y. January 28, 2003) ("In accordance with D.C. Code § 24-204 the Board <u>may</u> be <u>authorized to release a prisoner on parole in its discretion</u> . . . .") (quoting former 28 D.C.M.R. § 200.1) (emphasis added). Additionally, despite the existence of the scoring system, "the regulations expressly provide that the paroling authority may waive the results of the scoring system and either grant or deny parole in the individual case so long as it sets forth its reasons for the departure." <u>Brown</u>, 2003 WL 194206 at *4; <u>Duckett</u>, 795 F. Supp. at 137 (quoting former 28 D.C.M.R. § 204.22).

The Commission set forth its reasons for departing from the guidelines and denying Petitioner parole. <u>It is clear from examination of the record that in departing from the guidelines the Commission determined that the severity of Petitioner's offense of murder was not adequately taken into consideration in the initial calculation of Petitioner's guideline range.</u> [RX-20; RX-22]. <u>Because the Commission properly considered the nature of his offense to depart from the guidelines, that departure did not constitute improper double counting.</u> See,

11

e.g., Brown, 2003 WL 194206 at *4-5 (holding that while the Commission referred to several of the same factors which it considered in calculating the petitioner's guideline score, departure from guidelines did not constitute double counting because the Commission found those aggravating circumstances not to have been adequately accounted for in the score and that the mere calculation thereof failed to account for the petitioner's true risk to society); Puckett, 795 F. Supp. at 137 (holding no double counting when in deciding to depart from the guidelines the Commission relied upon factors that would not have been taken into account in calculating the prisoner's risk assessment). Thus, the Commission's decision to depart from the guidelines was not arbitrary, capricious, or an abuse of discretion. Accordingly, Petitioner's claim that the Commission engaged in double counting fails to state a claim for habeas relief.

C.    Petitioner Has No Expectation of Release.

Petitioner appears to complain that because the "special instructions for reconsideration" include the word "shall," such instructions created an expectancy of release upon the completion thereof. The D.C. parole guidelines, however, do not create a liberty interest in parole because the regulations remain discretionary. Madley v. United States Parole Comm'n, 278 F.3d 1306, 1311 (D.C. Cir. 2002); Ellis v. District of

12

Columbia, 84 F.3d 1413, 1420 (D.D.C. 1996). <u>See also</u> <u>Blair-Bey</u> <u>v. Quick</u>, 151 F.3d 1036, 1047 (D.C. Cir. 1998) ("the discretionary and open-ended District of Columbia guidelines cannot be construed to create a liberty interest"); <u>Franklin v. District of Columbia</u>, 163 F.3d 625, 631 (D.D.C. 1998) (stating that the D.C. parole guidelines do not create a liberty interest in parole). The Board has the discretion to depart from the guidelines, and may disregard the results of the scoring system if it does so in writing. <u>Ellis</u>, 84 F.3d at 1420; <u>see also</u> <u>McRae v. Hyman</u>, 667 A.2d 1356, 1357 (D.C. 1995) (stating that the scoring system under the D.C. parole guidelines is a "guide, not a rigid formula," and is not a constraint on the Board's discretion granted by the parole statute). Because Petitioner has no liberty interest in either being released on parole or in the Commission adhering to the guidelines, the Commission could not have violated his due process rights. Therefore, the Commission did not act arbitrarily, capriciously, or abuse its discretion for failing to grant Petitioner parole even though he allegedly completed all of the "special instructions for reconsideration." Accordingly, Petitioner's claim that parole should have been granted based upon his completion of those special instructions fails to state a claim for habeas relief.

13

Moreover, decisions whether to consider an inmate for an award are left to the discretion of the Commission and are not automatically earned upon the completion of certain criteria. See <u>Dicaro v. Perrill</u>, No. 94-1557, 1995 WL 607622 at *1 (10th Cir. Oct. 16, 1995); <u>Briggs v. United States Parole Comm'n</u>, 611 F. Supp. 306 (N.D. Ill. 1984), <u>aff'd sub nom.</u>, <u>Briggs v. Luther</u>, 753 F.2d 1077 (7th Cir. 1985). An inmate's favorable institutional conduct is a significant factor which the Commission should consider, but it is only one of the many factors that the Commission is obliged to consider in making its parole decision. In short, a positive institutional record, while significant, does not guarantee parole. <u>Page v. United States Parole Comm'n</u>, 651 F.2d 1083, 1087 (5th Cir. 1981). Thus, the Commission did not act arbitrarily, capriciously, or abuse its discretion in failing to award Petitioner a two-point deduction for program achievement. Accordingly, Petitioner's claim that he should have been granted parole based upon his program participation fails to state a claim for habeas relief.

E.    <u>The Commission Did Not Use Deceptive Language When Denying Parole.</u>

Petitioner argues that in denying parole, the Commission used deceptive language to "confuse the underlying criminal convictions." [<u>See</u> Petitioner's Memorandum of Law and Point of Authorities, at 5(c)]. Although Petitioner claims that the Commission's explanation seems to indicate that he used a weapon

14

during his burglary convictions, it is clear from the Commission's decision that it considered Petitioner's previous burglary convictions, his previous possession of a weapon conviction, and the fact that he used a weapon to take a life to evaluate whether Petitioner posed a serious risk to society.

Additionally, Petitioner's complaint that "the use of a weapon to take a life" is not cited in the plea agreement nor discussed at the arraignment for his second-degree murder conviction is nonsensical. Petitioner admitted that he shot the victim in the head with a weapon. There exists a rational basis in the record for the Commission's findings of fact. See Zannino, 531 F.2d at 691 (holding that the appropriate standard of review of the Commission's findings is whether there is a rational basis in the record for its conclusions and not whether the decision is supported by a preponderance of the evidence or substantial evidence). Thus, the Commission's decision was not arbitrary, capricious, or an abuse of discretion. Accordingly, Petitioner's claim that the Commission used deceptive language in denying parole does not state a claim for habeas relief.

F.    The Board and the Commission Did Not Abuse Their Discretion in Refusing to Grant Medical Parole to Petitioner.

Petitioner claims that he suffers from Hepatitis C, Diabetes, and a liver ailment. He argues that the Commission should have granted him medical parole pursuant to 28 C.F.R.

§ 2.77.  Because Petitioner applied for medical parole under both the D.C. medical parole regulations (D.C. Code § 24-464, et seq.) and the regulation for medical parole under the Commission's guidelines (28 C.F.R. § 2.77), this Court will analyze both guidelines.

Under the law existing prior to August 1998, if the Board determined that: (1) because of a medical condition an inmate is permanently incapacitated or terminally ill; and (2) the inmate's parole is not incompatible with the welfare of society, the Board may authorize the inmate's release on medical parole. D.C. Code § 464(b).

The current governing regulation, 28 C.F.R. § 2.77, provides that: "[u]pon receipt of a report from the institution in which the prisoner is confined that the prisoner is terminally ill, or is permanently and irreversibly incapacitated by a physical or medical condition that is not terminal, the Commission shall determine whether or not to release the prisoner on medical parole."  The regulation further provides that in the case of a medical condition that renders the prisoner permanently incapacitated, the Commission may authorize release on medical parole if the Commission finds that:  (1) the prisoner will not be a danger to himself or others because his condition renders him incapable of continued criminal activity; and (2) release on parole will not be incompatible with the

16

welfare of society. 28 C.F.R. § 2.77(c). The Commission also must consider the seriousness of the crime when determining whether medical parole should be granted prior to the completion of his minimum sentence. 28 C.F.R. § 2.77(d).

In 1996, the Board acted on the report of the DCDOC which evaluated the seriousness of Petitioner's crime, his disciplinary infractions, his positive urinalysis reports, and the fact that Petitioner was able to perform the functions of daily living and concluded that Petitioner was not eligible for medical parole. [RX-12]. In 1999, the Commission determined that even if Petitioner's health was what he claimed (because he had failed to provide the required documentation), he was not eligible for medical parole because of the severity of his crime and the fact that his illness would not render him incapable of committing additional violent acts. [RX-18]. In 2003, the Commission refused to reopen Petitioner's case based on his medical ailments because Petitioner had not provided the required documentation of his ailments as required by the regulations. [RX-24].

Both the pre- and post- August 1998 regulations are discretionary, and provide that the Board and/or the Commission _may_ release a prisoner on medical parole if the factors set forth in the regulations are met. Thus, even if those factors are met, Petitioner is not entitled to medical parole. Here,

however, it doesn't appear that Petitioner met the factors set forth in the regulations for eligibility for medical parole. In 1996, the Board, on the recommendation of the DCDOC, which had found that Petitioner did not meet the criterial for medical parole, denied his request. In 1999, The Commission determined that Petitioner's condition did not render him incapable of continued criminal activity under 28 C.F.R. § 2.77; therefore, Petitioner did not meet the criteria set forth therein.

Moreover, decisions for compassionate release are more properly weighed by the legislature and prison authorities than the courts. See, e.g., Engle v. United States, No. 00-6659, 2001 WL 1356205 at *2 (6th Cir. Oct. 5, 2001) (stating that the early release of terminally ill prisoners is a matter more properly weighed by the legislature and prison administration than the courts); Cerullo v. Gunnell, 586 F. Supp. 211, 213-14 (D. Conn. 1983) (the weight to be accorded health issues versus the seriousness of criminal charges is clearly entrusted to the discretion of the Commission). This Court will not substitute its judgment for that of the Commission in such matters. Accordingly, with regard to his claim that he should be released on medical parole, Petitioner has failed to state a claim for habeas relief.

AO 72A
(Rev.8/82)

IV.  Conclusion

   **IT IS RECOMMENDED** that the instant petition [Doc. 1] be **DENIED.**

   The Clerk is **DIRECTED** to terminate the referral to the undersigned magistrate judge.


   **IT IS SO RECOMMENDED** this ___7___ day of _Octob___, 2003.

                                    C. CHRISTOPHER HAGY
                                    UNITED STATES MAGISTRATE JUDGE

20

AO 72A
(Rev.8/82)