SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CRIMINAL DIVISION

- - - - - - - - - - - - - - - :
                                :
4    UNITED STATES OF AMERICA    :
                                :
5              v.               :    Criminal Action No.
                                :    F-09286-88
6    JAMES WASHINGTON,           :
     a/k/a LARRY D. EPPS,        :
7                                :
              Defendant.         :
8    - - - - - - - - - - - - - - :

Washington, D.C.

Tuesday, June 26, 1990

The above-entitled matter came on for hearing before the Honorable RICARDO M. URBINA, Associate Judge, in courtroom number 313.

THIS TRANSCRIPT REPRESENTS THE PRODUCT OF AN OFFICIAL COURT REPORTER, ENGAGED BY THE COURT, WHO HAS PERSONALLY CERTIFIED THAT IT REPRESENTS THE ORIGINAL NOTES AND RECORDS OF TESTIMONY AND PROCEEDINGS IN THE CASE AS RECORDED.

APPEARANCES:

On behalf of the Government:

PAUL G. HOWES, Esquire

On behalf of the Defendant:

CARRIE FAIR, Esquire

BRUCE W. HERZFELD, RPR
OFFICIAL COURT REPORTER

1

PROCEEDINGS

\* \* \* \* \* \*

1

2          THE CLERK:  The case of the United States versus

3  Larry D. Epps, also known as James Washington, F-09286-88.

4          MR. HOWES:  Good morning, Your Honor.  Paul

5  Howes, H-O-W-E-S, for the United States.

6          MS. FAIR:  Carrie L. Fair, counsel for Mr. Epps.

7          THE COURT:  All right, Mr. Epps' matter -- I

8  don't see it on the calendar.

9          MR. HOWES:  It is a show cause hearing, Your

10 Honor.

11          THE COURT:  I see.  Yes.  Mr. Epps is before the

12 Court on the Court's order to show cause as to why

13 probation should not be revoked, probation which was

14 imposed on April the 9th, 1990.  Specifically the violation

15 alleges that the basic condition of probation, which was

16 successful participation in and completion of the -- was it

17 the Stout Street program?

18          MR. HOWES:  That's correct.

19          THE COURT:  The Stout Street program was not

20 complied with by Mr. Epps, and as a result of that, he is

21 in violation of probation.  Is that the basic allegation?

22          HOWES:  That's correct.

23          :  Your Honor, may I inquire as to

24 whether        tion officer Mr. McNeil is here?  I don't

25

                                                          2

1    believe so.  If he is not here, may we have this matter

2    passed until he does appear?  I believe he is on his way.

3              THE COURT:  He was copied on this show cause

4    order.

5              THE CLERK:  He called, and he was on his way

6    seven or eight minutes ago.

7              MS. FAIR:  I just talked with him last evening,

8    and he indicated he would be here.

9              THE COURT:  We need his input on this, so we will

10   pass on it.  Do you have other business, Mr. Howes?

11             MR. HOWES:  Just across the hall.  I will come

12   right back, Your Honor.

13             MS. FAIR:  Thank you, Your Honor.

14             (Brief recess.)

15                       AFTER RECESS

16             (Jury not present.)

17             THE COURT:  Recalling the case of the United

18   States versus Larry Epps, that is F-09286-88.

19             MR. HOWES:  Paul Howes on behalf of the United

20   States.

21             MR. McNEIL:  Good morning, Your Honor.  Albert

22   McNeil for Adult Probation.

23             MS. FAIR:  Carrie L. Fair, counsel for Mr. Epps.

24             COURT:  Mr. Epps is present.

25             Epps is before the Court on the Court's order

3

1  or show cause which stems from a violation report filed
2  by Probation which specifies that Mr. Epps failed to
3  complete the long-term in-patient and out-patient drug
4  treatment program, and it specifically details that on
5  April 19, 1990, Mr. Epps was placed on five-year probation
6  and ordered by the Court to enter and complete a long-term
7  in-patient and out-patient drug program and undergo weekly
8  drug testing the first year after its completion, and
9  biweekly the second year after treatment as well; also that
10 Mr. Epps obtain employment, participate in community
11 service, and pay $250 as a victims' compensation fund
12 assessment.

13       The Court is advised that Mr. Epps entered the
14 Stout Street program on April the 25th, 1990, and that
15 absconded from the program on May the 15th, 1990.  Upon an
16 office visit on May the 16th, Mr. Epps expressed to the
17 probation officer that he felt the program -- that he left
18 the program because he just could not make it at Stout
19 Street.

20       On the 17th of May, Mr. Epps was enrolled in the
21 ADASA urine surveillance program (phonetic), and he was, at
22 the time of the writ   of the report, next scheduled for
23 contact with the pro     officer on June the 4th, 1990.
24       It is l    ged that Mr. Epps is not
25 employed, has not         himself with community service,

                                                            4

1   and has not paid the victims' compensation fund assessment

2   as of the writing of the report.

3          Are there any additional allegations, Mr. McNeil?

4          MR. McNEIL:   None, Your Honor.

5          THE COURT:   What is the recommendation of

6   Probation?

7          MR. McNEIL:   Your Honor, as of the 22nd of June,

8   he was enrolled in the CADAC program.   As I explained to

9   his attorney, CADAC, six months, that is not the length of

10  time that Stout Street is.

11         My assessment of this young man is that he needs

12  some in-patient drug treatment.   He can go on forever and

13  forever and forever and find himself in situations of being

14  locked up and getting in the jackpot, but he desperately

15  needs an in-patient drug treatment program.

16         I understand the fact that he is in contempt, so

17  to speak, but he didn't complete the Stout Street program.

18  When I talk to him on occasions, he really seems at times

19  not to be in touch with the fact of the -- with the

20  seriousness of his drug situation and the seriousness of

21  the offense he committed -- because the fear of -- the fear

22  of -- it has     ose a time where the fear of staying in

23  the progra.       ing to bring about change has to be

24  greater th           r of -- or the fear of not changing

25  has to be              an the fear of trying to change.   You

1    know, the fear of being incarcerated has to be greater than

2    that fear of change.

3          It seems that he has to have some type of

4    understanding that in these programs things are just not

5    going to go his way, and CADAC is just a lesser term in

6    terms of time than Stout Street, but it is the same type of

7    program.

8          I am all for him staying in the treatment, but I

9    don't know, Your Honor, he -- I am keeping my fingers

10   crossed that if he was allowed to stay in treatment, that

11   he would make it in the treatment program, whatever it

12   would take.

13          THE COURT:  The plea in this case was to second

14   degree murder?

15          MR. HOWES:  That's correct.

16          THE COURT:  Ms. Fair?

17          MS. FAIR:  As a matter of clarification, if I

18   may, Your Honor, I believe Mr. McNeil -- please correct me

19   if I am wrong -- is saying that Mr. Epps is in a program

20   now, CADAC, which is a program at St. Elizabeth's Hospital.

21   It's a therapeutic program, as I understand it, which is

22   the same as Stout Street.  It, of course, does not have the

23   length Stout Street has.  Stout Street, as I

24   understand, is a program where you are in residence for

25   two years, and CADAC on the other hand is a

1  program where you are in residence for six months, you are

2  out for six months, and I believe it can be extended, based

3  on the conversations that I have had with persons at CADAC.

4  And we do have someone here in the courtroom, a Ms.

5  Chestnut, from CADAC this morning.

6      Getting back to Mr. McNeil's recommendation, I

7  believe his recommendation is that Mr. Epps does need

8  treatment.  He is enrolled in CADAC now.  He would like to

9  see him stay in CADAC, and he would like to see him make

10  it, and he has his fingers crossed.  That to me means, and

11  please correct me if I am wrong, Mr. McNeil, that Mr.

12  McNeil is recommending that the Court permit him to stay in

13  that program.  Am I correct?

14      MR. McNEIL:  That's correct, Your Honor.

15      MS. FAIR:  If I may take off from that point,

16  then, Your Honor, we have a recommendation from the

17  probation officer Mr. McNeil, who is saying that he does

18  need treatment, and he is in a program now, and I would

19  like to see the Court permit him to stay in that program.

20  I believe Mr. McNeil is also indicating that he is going to

21  continue to work with Mr. Epps.

22      I would just like to give the Court some

23  background information here, which I hope will clarify the

24  cold black        situation of the words on the piece of

25  paper, the        ng a violation report, if I may.

7

1          THE COURT:  Yes, ma'am.

2          MS. FAIR:  Yes, it is true, Mr. Epps did enroll

3      in the Stout Street program.  That is a therapeutic

4      community that is located out in Colorado, Denver.  Before

5      going to Stout Street, he also probably could have gone to

6      another therapeutic community which also has a long

7      residence program, perhaps two to three years, at Delancey

8      House, which is, as I understand it, in Philadelphia, I

9      believe, or some part of --

10         THE COURT:  There is one in New York and there's

11     another one --

12         MS. FAIR:  New York.

13         We were in the process -- and when I say "we,"

14     I'm speaking of Ms. Betsy Biben from the ORD at the Public

15     Defender Service -- of working with Mr. Epps to see if we

16     could get him enrolled in that program, Delancey House.

17         I had talked with Assistant United States

18     Attorney Mr. Howes, and Mr. Howes was able to get Mr. Epps

19     into the Stout Street program, and that is because I

20     believe Mr. Howes has worked with people at Stout Street,

21     and his request was sufficient for Mr. Epps to get into the

22     program without Mr. Epps having to go through the usual

23     admission program which would determine whether or not

24     this was the right program for him and whether or not he

25     was r      his program.  Those steps were bypassed, so

                                                              8

1    none of that happened.

2            If Mr. Epps had waited, as I had wanted him to --

3    and my warning him to wait was solely based on the fact

4    that Ms. Biben had talked with him and had determined,

5    based on information that she had about those two programs

6    and other programs, that Mr. Epps probably was

7    inappropriate for the Stout Street program.  This was

8    information I received from Ms. Biben after I had talked

9    with Mr. Howes and sought his help in terms of helping Mr.

10   Epps find the program.

11           I talked with Mr. Epps, and I said to him, "I

12   believe you need to wait and let us pursue the Delancey

13   program, and if that is not appropriate, then we will go to

14   another program."

15           Mr. Epps was most anxious to go into the Stout

16   Street program because it was a program that Mr. Howes had

17   been able to get him into.  He wanted to go ahead and not

18   disappoint Mr. Howes, and his feeling was, "Let me go.  I

19   think I can make it.  If I can't make it, then I will come

20   back here, I will tell you, I will go to court, and I will

21   tell the Court."  That was not the route that I wanted to

22   take.  So     Epps went to the Stout Street program.

23            the time that he arrived, the person in charge

24   of the        and who had agreed to take Mr. Epps without

25   any of        ions process, without any of the

                                                              9

orientation, was not there, and quite frankly, Mr. Epps was
not expected.  He was, however, taken into the program, and
that was solely on the basis of Mr. Howes' request, his
request that they help him take him into the program.

Yes, Mr. Epps had difficulty, and I think a lot
of the difficulty came from the various peer group
interactions.  I guess for lack of a better word, it can be
described as raising, where the peers sit around and talk
about it.  He had difficulty with that.

It is my understanding that the so-called leaving
the program occurred when he was on a work site, and
apparently there was some controversy, and rather than stay
and get into what Mr. Epps considered to be trouble, he
just said all right, he left and started walking back to
the residence.  Of course, he ended up at the residence.
He didn't try to flee, he went right back there.  His bags
were packed, and that was because this was considered a
violation of the program.  In other words, you don't walk
off the work site, you stay there.

Technically speaking, Mr. Epps at that point did
not have a chance to stay into the program or to leave.
His bags had been packed, and he was on his way.  The
ticket was issued for him.  His feeling is that the
situation was that "I did not leave the program, but I
had, in according to the rules, walked off the site,

10

1   even though I was headed back to the residence house, and
2   that was a violation.  I was not given another chance."
3   So, yes, that ended the Stout Street program for him.

4        Now, Stout Street gave Mr. Epps a ticket, an
5   airline ticket, to Washington, D.C.  He boarded the plane,
6   came directly back here, called up everyone, including me,
7   and said, "I am back."  He didn't take a detour, he came
8   directly back here.  He got in touch with Probation again.

9        Daily Mr. Epps talked to me about getting a job.
10  This goes to his not having a job at the time that this
11  violation report was written.  My response to Mr. Epps was,
12  "I don't think you need to be out on the street working."
13  This was even though he was involved in the urine
14  surveillance program, and he was also involved in going to
15  the meetings that they have every day, the narcotics
16  meetings.  I think it is Narcotics Anonymous.  He may also
17  have been going to the AA meetings.

18       Finally, Mr. Epps did get a job, and he had
19  already been registered with the CADAC program and was
20  waiting for a bed.  Of course, he was a number along with
21  several other men who were waiting to get into this
22  program.  I know that for a fact because I was having
23  almost daily contact with the people at CADAC, a Ms.
24  Singletary isn't here today, but Ms. Chestnut is here,
25  and she is assistant to Ms. Singletary.

11

1          Finally we got Mr. Epps into the program.  At the

2    time that Mr. Epps went into the program, he was clean, he

3    had continued his urine surveillance, and he had also been

4    working because he had gone out and gotten a job on his

5    own, and here he is today.

6          Why do I go through this long saga?  Because I am

7    trying to help the Court understand who Mr. Epps is.  I

8    think that is important.  Mr. Epps is a man who has a drug

9    problem.  He knows that.  Mr. Epps wants to be in

10   treatment.  He was out on the street.  He could have

11   pursued treatment and gotten into a treatment program or

12   waited around until he was picked up.  Or better still, he

13   could have gone elsewhere other than return to this area

14   and say to the Court, "Here I am, I am ready for the

15   hearing."  Moreover, he could have just waited around and

16   not done anything to help himself.

17         Well, that is not Mr. Epps.  Mr. Epps has used

18   his resources to help get himself into a drug treatment

19   program.  He was able to get a job.  He has been clean, and

20   he is now in a program.  If this is not the program that

21   the Court deems appropriate for Mr. Epps -- and the Court

22   may not    it appropriate because it is not the long-term

23   progr..    the Court ordered -- well, Mr. Epps is in

24   trea          is here available for another kind of

25   prog

                                                        12

1         I deemed it necessary for him to be off the

2    street and into at least some kind of therapeutic program,

3    and CADAC appeared to be the program, and it really was not

4    easy getting him in the program when there was this long

5    waiting line.  But we managed it, and here he is today, and

6    Ms. Chestnut is here, and if the Court wishes to have any

7    information about the program, she is available to give

8    that information.

9         We also have in court Mr. Rufus Mayfield, who is

10   with the District Government Human Resources, who has known

11   Mr. Epps for a long, long time, and he is interested enough

12   to come and say please give Mr. Epps another chance.

13         We also have a Mr. Milner here, another

14   upstanding citizen, who is an employee with the United

15   States Department of Energy, and he is here for the same

16   reason, to give some kind of character input to the Court

17   with respect to Mr. Epps.

18         Now, Your Honor, we are very much aware that the

19   last time we were here, the Court gave Mr. Epps a chance,

20   very much aware of that.  But what we want the Court to

21   realize    that Mr. Epps, even though he did not stay in

22   the Stop     et program, has not done away with that

23   chance        not want to do something that was

24   irrep.          he walked away.  Maybe that wasn't the

25   thing        his mind it was better to walk away than

                                                                 13

to do something else which might be worse, and he
considered his walking away not to be leaving the program,
but to be walking away from a situation that he could not
handle and to go back to the residence.

He believes that he can make it at CADAC.  The
people at CADAC believe that they can help him make it.  We
are asking the Court not to take away the opportunity that
the Court gave him when we were here.

THE COURT:  All right.  Mr. Howes?

MR. HOWES:  Who is Larry Epps?  Larry Epps is
talented, Larry Epps is intelligent, Larry Epps is
creative.  Larry Epps is also arrogant and insecure.  Larry
Epps had a chance to go to Stout Street and exchange 12
years to life for two to three years of a program this man
desperately needs.  What did he do?

I got him in Stout Street.  The United States
Government went to bat for Larry Epps because of his
contributions and because we believed Larry Epps could be a
credit to society.  Larry Epps knew where he was going.
Larry Epps wanted to go.  Larry Epps had lots of people
tell him what was expected of him.  He wanted to do it.

It is       when he arrived, on the day he
arrived, there         x-up in terms of his arrival.  But
they took Lar         nto Stout Street based on my
recommendati              on the people I have placed there,

14

1    based on my reputation and my say-so.

2          He was there for some 45 days, or 30 days, but

3    before he walks off the job, as Ms. Fair detailed to the

4    Court, the day before I spoke to him on the phone, they

5    called me and said, "We have got a problem," and Larry Epps

6    and I talked on the phone late at night when he called me

7    collect at my house because the program knows before they

8    let him walk out the door, they need to get ahold of me.  I

9    have had some other people in that program who have

10   adjustment problems.  Because once a junky gets into that

11   program and gets off the stuff and realizes that he has to

12   take responsibility for his own life, and because he has

13   got some freedom, because there are jobs and things in that

14   program, gas stations and workhouses and things, he has

15   also got to face the fact that every day he has to work,

16   and every day is not easy.  In that program for the first

17   year, there are programs where people yell at you, people

18   test you, people put you through mind games, all of that to

19   take somebody with a drug treatment program and get them to

20   adjust to the fact that they have to deal with the burdens

21   of that, and they have to deal with the burdens of the

22   world.

23          I got one call from Larry Epps saying, "I

24   can't take ... young-uns yelling at me.  I can't take

25   these young ... ing these mind games.  Paul, I don't

                                                          15

1   play games." My point to Larry Epps was, "Larry, if they

2   want you to stand on your head for two years so that you

3   can beat a drug beef, so that you can get your life back in

4   order, and so you don't have to go back to a cage for 12

5   years to life, aren't you smart enough and aren't you

6   intelligent enough and aren't you determined enough to do

7   that," and the next day Larry Epps walks off the site, and

8   they had no choice, because the director called me and

9   said, "Paul, before we had a serious problem, we had to put

10  him on a plane.  I couldn't let him stay here."

11          Now, I have had other people call me, and I have

12  had other people go through this.  It is not easy.  But

13  Delancey Street is no easier.

14          The other side of this coin, Your Honor, is that

15  Larry Epps got a huge break in this Court and a huge break

16  from the United States Government.  He got it on one hand

17  because of what he did for the Government, and two, because

18  of what we believed he could be.  But, three, he didn't

19  have a choice.  The probation -- the sentence of the Court

20  and his agreement with my office was not if I can't make it

21  at Stout Street, I will come back on my own.  I'll make it

22  someplace else.          can't make it there, I will make it a

23  third place.  T.      't the agreement.

24          What           to people at Stout Street or

25  Delancey Stre          f the tough programs in this

1    country when we say all right, we will give you the chance,
2    Mr. Epps, we will send you to Stout Street, you make it.
3    When he decides that he can't make it, he walks away.  What
4    does that say to the rest of the people at Stout Street?
5    Oh, if you don't want to make it here, you go back to
6    Washington and go on with your life?

7         He got there because he has a drug program.  He
8    got there because of his criminal involvement.  And all Mr.
9    Epps had to do was to say, "I will put my arrogance aside,
10   I will put my insecurity aside, and I'll take what they
11   dish out to me for two years and make myself better.  That
12   is the least I can do."

13        What Mr. Epps couldn't stand was some young
14   people in a program who -- they have varying degrees of
15   what counsel called raising -- programs where they do
16   subject the addict, the resident, to some very stringent
17   mind games and some very stringent reality games.  Mr. Epps
18   doesn't like to play games.  Mr. Epps is standing here
19   playing the biggest game of all, and it's a con game.  Mr.
20   Epps is saying, "I am 30 some years old, Your Honor, and if
21   I don't want that program, well, put me in another one."
22   That was not the agreement.

23        This      States Attorney, Assistant United
24   States Attorn.        go to bat for Larry Epps so that
25   Larry Epps c        is program.  I went to bat for Larry

17

1    Epps because I think he could make it.  But Larry Epps

2    doesn't want to make it, and I think Mr. McNeil's concerns

3    here are that Mr. Epps has yet to tune into the fact that

4    he is a junkie, has been a junkie, spent most of his life

5    in jail, and he doesn't want to deal with that.  There is

6    the problem.  If you let Larry Epps dictate what program he

7    wants, and where he wants to go, and what he wants to do,

8    well, what you have said to other people in programs is you

9    can dictate it yourself; and, two, you've said to Larry

10   Epps you don't have to confront the beast.

11           I believe he can make it, but I also believe that

12   unless it is two to three years of a very, very tough

13   program for him and for other people like him, then we make

14   that whole system silly.

15           THE COURT:  What is your recommendation?

16           MR. HOWES:  We put him back in jail until he can

17   get into Delancey Street.  For me my recommendation was he

18   had his shot.  He walked away from the program.  He has a

19   sentence to serve.  But if the Court deems it appropriate,

20   put him back in jail until Delancey Street will take him.

21   I don't recommend that, but possibly the Court would accept

22   that.

23                        R:  May I be heard, Your Honor?

24                        ES:  If I may finish, Your Honor?

25                        T:  Yes, sir.

                                                        18

1     MR. HOWES:  The Court knows the representations I

2     make -- made for Mr. Epps throughout.  I kept my end of the

3     bargain.  Mr. Epps knew when he left here what was expected

4     of him.  He knew the agreement he got, and he knew the

5     bargain he got.  Mr. Epps has chosen not to make it.

6            THE COURT:  Briefly, Ms. Fair?

7            MS. FAIR:  Your Honor, I think part of the reason

8     Mr. Epps is here before the Court today is because Mr. Epps

9     didn't listen to his attorney, and I am his attorney.  The

10    person Mr. Epps listened to and the person he wanted to

11    please was Mr. Howes.  And I said, "Mr. Epps, Stout Street

12    is not it," because I had done my own investigation, and he

13    ignored me, and he said, "Mr. Howes wants me to do this,"

14    and I said, "It is not your program.  You won't make it

15    there.  Don't go there."  And what he said was, "Mr. Howes

16    wants me to do it."  So, it was more important that he

17    please Mr. Howes, and that is what he sought to do.  It was

18    the wrong program, and that is why he is here today.

19            What I am asking for is for time to be taken to

20    determine which is the program for Mr. Epps.  I think if we

21    are really serious about helping this man and giving him

22    the opportunity,    think that time needs to go into what is

23    the therapeutic    gram, and there are millions of them out

24    here, where w         put this man.  Not any therapeutic

25    program will          ny and everybody who has a drug

                                                            19

1    problem.

2    As his counsel, now that he is here and has to

3    listen to me, I am asking this Court to follow through on

4    the opportunity that he was given, and I firmly believe,

5    and, in fact, know that there is a program for him, and

6    what I would like to see is for him to stay in the CADAC

7    program six months, until I can have the opportunity, which

8    this Court asked me to do when we were last here, for him

9    to work with his counsel to find that program.  I didn't

10    have the opportunity to do it, and that is what I would

11    like to do, Your Honor, and I think I can do it.

12    MR. McNEIL:  Your Honor, I would like to offer

13    something just briefly.  As Your Honor knows, I work with

14    all the clients that come through the D.C. Superior Court

15    and go to Delancey Street, Stout Street, and all programs

16    around the country, including the programs inner city,

17    CADAC, Rap, Second Genesis.

18    I am here to submit that if leniency is shown

19    once again to this client, that CADAC in six months

20    in-patient and one year out-patient is just as effective as

21    any long-term program.  I work closely with CADAC.  We have

22    almost 70 clients  ADAC.  If he stays in that program

23    and makes himsel    able for treatment and doesn't run

24    out of there and       to treatment, he will begin to

25    change his life       s there.

20

1          What Probation has come to offer to the Court,
2   that since he is in the CADAC program right now, that if he
3   can be allowed to remain in CADAC, and given a review date
4   perhaps in maybe four months or three months to come back
5   and see how he fares since being in there, that we could
6   make a determination at that point.
7          I think this young man is salvageable Your Honor,
8   even though he may not really feel that secure within
9   himself.
10          THE COURT:  I understand.
11          MR. McNEIL:  But he has a serious drug problem,
12   and I think for the first time in his life that he has been
13   he still long enough to understand the seriousness of his
14   drug problem.
15          THE COURT:  Conclude, Mr. McNeil.
16          MR. McNEIL:  That is it.
17          THE COURT:  Is there anything that you want to
18   say on your own behalf, Mr. Epps?
19          THE DEFENDANT:  Yes, Your Honor --
20          MS. FAIR:  If I may just for a moment, Your
21   Honor?
22          THE DEFENDANT:  Inasmuch as I came back to the
23   city ...    't get involved in any drug activity or
24   anyt        ill need a drug treatment program, and I know
25   that         honorable Court will allow me to continue in

21

1    CAPAC with this program, I would appreciate it.

2            THE COURT:  1988, a conviction for attempted

3    taking property without a right.  1986, burglary in the

4    second degree.  1975, carrying a dangerous weapon, a gun.

5    1984, possession of cocaine.  1978, Bail Reform Act

6    violation.  1978, breaking and entering a vending machine.

7            Now, at the time of the commission of the offense

8    before the Court, you were on parole.  The adjustment

9    reflected on the Pretrial Service report, which was then

10   prepared in connection with your bond status when this case

11   entered the system, described your adjustment on parole as

12   poor.

13           It was with some degree of surprise that I heard

14   the Government articulate strongly in your favor, urging

15   the Court to place you in this program.  I was very pleased

16   to know that a representative of the United States

17   Government can operate in a rational, sensitive, and caring

18   way and not have a knee-jerk reaction to an individual

19   simply because that individual has committed a crime.

20           I gave the Government representations a lot of

21   weight.  I understood not only the value of your

22   participation      other matters that assisted the

23   Government,         nced as well that Mr. Howes was

24   personally            with your potential as an individual

25   who came in            inal justice system in this case with

                                                        22

1    a very long history of offenses against the citizens of the

2    District of Columbia.

3         Juxtaposed against that fact is the fact that you

4    have demonstrated your capacity for doing work, your

5    intelligence.  You have other aspects that strongly

6    suggest, as your lawyer has indicated, that you are

7    salvageable.

8         But the Court cannot order somebody to be

9    motivated.  The Court cannot order somebody to have the

10   guts, the backbone, the fortitude, the temerity, whatever

11   you want to call it, to do the hard thing.

12        This litany of criminal offenses, Mr. Epps, means

13   one of two things.  Either you have been such a bad junky

14   for so long that you cannot control your lawlessness, or

15   you are a premeditated career offender who needs a

16   substantial sentence so that you can be separated from the

17   community.  If it is the former rather than the latter,

18   then no one knows more than you what trouble drugs have led

19   you into.  If it is the former rather than the latter, I

20   cannot imagine more of a powerful force to motivate you to

21   stay out of jail.  It is unimaginable that anyone with this

22   record, know    that they have done, the harm they have

23   inflicted o      ndividuals and the community, knowing

24   what is fa          knowing that in a highly unusual

25   gesture th           t has joined strongly in insulating

                                                         23

you re attempting to insulate you from incarceration, that
you could not muster up the courage, the backbone, the
temerity to deal with the hard task of operating within a
drug program.

You know, when people go into the army, they are
confronted with the same type of thing, and the reason in
that instant is to prepare the individual to do the hard
thing, if necessary die for their country, if necessary
kill for their country.  When you go into a drug program,
you are being asked to do the hard thing so that you can go
back out into the community, you can resist the temptations
that surround you, you can deal with the rigors of leading
a successful life from day to day to day, constantly
fighting off that euphoric reference that will never leave
you called drug addiction, and in the same effort keep away
from the kind of lawlessness and harm and damage that you
have done others as well as yourself.

You didn't do it, and what is more your record
suggests, your attitude suggests, everything suggests that
you are not going to do it because fear is obviously not a
catalyst that wi   move you to function like a man.  Fear
is not the cata       hat will move you to function like a
man, and the           and the heartfelt motivation of your
attorney is          be transplanted into your
backbone.

24

1          You deserve no more chances, and you will get

2    none from me.  The sentence originally suspended is

3    imposed, 12 years to life.

4          MR. HOWES:  Thank you, Your Honor.

5          MS. FAIR:  Good day, Your Honor.

6          (Proceedings concluded.)

CERTIFICATE

1, Bruce W. Herzfeld, an Official Court Reporter for the Superior Court of the District of Columbia, in my official capacity, do hereby certify that I reported by machine shorthand the proceedings had and testimony adduced in the case of United States of America versus James Washington, a/k/a Larry D. Epps, case number F-09286-88, in said court on the 26th day of June, 1990.

I further certify that the foregoing 25 pages constitute the official transcript of the proceedings as taken from my stenographic notes and reviewed with my backup tapes to the best of my ability.

In witness whereof, I have hereunto subscribed my name this 25th day of April, 1991.



Official Court Reporter

RECEIVED

APR 2 9 1991

Appeals Coordinator's Office

26